16 A.3d 159

**SCAPA DRYER FABRICS, INC.**

v.

**Carl L. SAVILLE.**

**No. 39, Sept. Term, 2010.**

Court of Appeals of Maryland.

March 23, 2011.

498

David J. Shuster (Ezra S. Gollogly, Kramon & Graham, P.A., Baltimore; Malcolm S. Brisker, Goodell, DeVries, Leech & Dann, L.L.P., Baltimore), on brief, for petitioners.

Michael T. Edmonds (Timothy J. Hogan, the Law Offices of Peter T. Nicholl, Baltimore), on brief, for respondent.

Jerome A. Murphy, William L. Anderson, Andrew D. Kaplan, Crowell & Moring LLP, Washington, D.C., for Amicus Curiae brief of the Coalition for Litigation Justice, Inc.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

Petitioner, Scapa Dryer Fabrics, Inc. ("Scapa"), appeals the Court of Special Appeals's decision in *Scapa v. Saville,* 190 Md.App. 331, 988 A.2d 1059 (2010) (*"Saville II "*) affirming the judgment of the Circuit Court for Baltimore City, which awarded damages to Respondent, Mr. Carl L. Saville ("Mr. Saville").[1] Petitioner asks us to review alleged procedural errors by the trial judge, review the sufficiency of the evidence presented on the issue of causation regarding Respondent's negligence claim, and to reduce the amount of compensatory damages in light of settlement payments received by Respondent from special trusts created under federal bankruptcy law.

---

1. Respondent moved to strike a report, which Petitioner appended to its "Reply Brief" submitted to this Court. The report is outside the scope of the record because it was not included in the "original papers filed in the action in the lower court...." Md. Rule 8–413. As such, it should not have been included in Petitioner's Reply Brief. Md. Rule 8–501(f) ("The appellant may include as an appendix to a reply brief any *additional part of the record "*) (emphasis added). Thus, the report was not considered. Nor did we consider materials appended to Mr. Saville's "Motion to Strike" as they similarly were not part of the record below. Mr. Saville's "Motion to Strike" is hereby granted.

We shall affirm the judgment in part and reverse in part and remand for further proceedings.

## Facts and Procedural History

On June 14, 2002, Carl and Sharon Saville filed suit against approximately 30 companies [2] claiming negligence, strict liability, loss of consortium, conspiracy and fraud relating to Mr. Saville's asbestosis, lung cancer and mesothelioma. A judgment against Scapa was entered on October 15, 2003 in the amount of $3,000,000.00. In an unreported opinion, the Court of Special Appeals vacated that judgment, *Scapa v. Saville,* No. 2172, Sept. Term, 2004 (Nov. 17, 2005) (*"Saville I"*) and remanded the case for a new trial. Prior to commencement of the new trial, Mr. Saville settled with three defendants, against whom Scapa unsuccessfully asserted cross-claims for joint tort-feasor liability and contribution, namely Viacom, Inc. f/k/a Westinghouse Electric Corp. ("Westinghouse"), Asten-Johnson, Inc. ("Asten"), and Albany International Corp. ("Albany"). The new trial began on January 8, 2008 and concluded on January 25, 2008. The jury found Scapa and co-defendant Wallace and Gale Asbestos Settlement Trust ("W & G") to be jointly and severally liable and returned a verdict in the amount of $1,718,000.00. The trial judge subsequently

2. The defendants included: ACandS, Inc., Hopeman Brothers, Inc., Uniroyal, Inc., Lloyd E. Mitchell, Inc., Rapid American Corp., Westinghouse Electric Corp., General Refractories, Co., The Flintkote, Co., Durabla Mfg., Co., E.L. Stebbings & Co., Hampshire Industries, Inc., Quigley Company, Inc., Georgia Pacific Corp., Metropolitan Life Insurance, Co., Selby, Battersby & Co., Foseco, Inc., Union Carbide Corp., Amchem Products, Inc., Pfizer, Inc., Dana Corp., Certainteed Corp., Combustion Engineering, Inc., Anchor Packing, Co., Garlock, Inc., International Paper Co., Foster Wheeler Corp., Bertram C. Hopeman, J.E. Stegierwald Co., Inc., 3M Co., Cutler–Hammer Inc., The Eaton Corp., McCormick Asbestos Co. On January 30, 2003, Mr. Saville added Scapa Dryer Fabrics, Inc. ("Scapa") as a defendant. Wallace and Gale Asbestos Settlement Trust ("W & G"), a defendant at trial in Baltimore City and Co–Petitioner on appeal to the Court of Special Appeals, was added by Scapa's third-party complaint and then as a defendant by interlineation on November 10, 2006 in Mr. Saville's case. Prior to trial, ACandS, Inc., Combustion Engineering, Inc., Dana Corp., and Lloyd E. Mitchell, Inc. filed petitions in bankruptcy and Mr. Saville ultimately dismissed all claims against them.

reduced the verdict to account for settlement payments that Mr. Saville had received from certain bankrupt asbestos-containing product manufacturers, namely Celotex Trust, the Johns Manville Personal Injury Settlement Trust, and the H.K. Porter, Inc. Asbestos Trust, resulting in a final verdict of $1,684,415.00. Scapa moved for judgment notwithstanding the verdict ("JNOV") as to Mr. Saville's claims and as to its cross-claims. Both motions were denied, as was Scapa's request, in the alternative, for a new trial, and for a reduction in the verdict to account for any and all bankruptcy trust payments received by Mr. Saville. Final judgment was entered on April 30, 2008 and appeals were timely noted.

The Court of Special Appeals affirmed the Circuit Court's judgment in *Saville II,* holding, relevant to the instant case: that there was sufficient evidence that Scapa's product was the proximate cause of Mr. Saville's injuries to support the trial court's denial of Scapa's motions for judgment and for JNOV; that Mr. Saville's "admissions" did not conclusively establish liability against the settling cross-defendants; that the trial judge's denial of Scapa's JNOV motion on its cross-claims would not be disturbed on the basis of procedural defects; and that the trial court had no evidence upon which to base further reduction of the verdict. *Saville II,* 190 Md.App. at 348, 351, 353, 988 A.2d at 1068, 1070–71.

Scapa presents the following questions to this Court, which we slightly reworded and reordered for clarity:

1. Did Mr. Saville present sufficient evidence to satisfy the "frequency, regularity, proximity" test for substantial factor causation of Scapa's products for his injuries?

2. Did Scapa preserve its right to move for JNOV on its cross-claims?

3. Did Mr. Saville's admissions under Md. Rule 2–424(d) "conclusively establish" liability against the settling cross-defendants?

4. Should the judgment against Scapa be reduced under the Maryland Uniform Contribution Among Joint Tort-feasors Act to account for payments that Mr. Saville

received from trusts established pursuant to 11 U.S.C. § 524 of the Bankruptcy Code (" § 524(g) Trusts")?

## I. Scapa's *Balbos* claim

Scapa challenges the Court of Special Appeals's application of the "frequency, regularity, proximity" test, enunciated in *Eagle–Picher v. Balbos*, which is the common law evidentiary standard used for establishing substantial-factor causation in negligence cases alleging asbestos exposure. *Balbos*, 326 Md. 179, 213, 604 A.2d 445, 461 (1992) (holding that "[t]he jury ... could find that the decedent was frequently exposed to fibers from the Eagle "66" asbestos cement in the proximity of the engine room of ships where that product was regularly used."). Our task upon Scapa's challenge to the sufficiency of Mr. Saville's evidence, is to determine whether the intermediate appellate court's judgment upholding the trial court's dismissal of Scapa's motions for judgment and for JNOV on Mr. Saville's claims was in error.

An appellate court reviews "the trial court's decision to allow or deny judgment or JNOV to determine whether it was legally correct[,]" *Saville II*, 190 Md.App. at 343, 988 A.2d at 1065 (citing *Houghton v. Forrest*, 183 Md.App. 15, 26, 959 A.2d 816, 823–24 (2008)), while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented. *See* Md. Rule 2–519 (2010) ("Motion for Judgment"). We will find error in a denial of a motion for judgment or JNOV if the evidence "does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty." *Saville II*, 190 Md.App. at 343, 988 A.2d at 1066 (quoting *Bartholomee v. Casey*, 103 Md.App. 34, 51, 651 A.2d 908 (1994)). Our resolution of this question in Scapa's favor would render the remaining questions moot, therefore, we address it first.

In *Balbos*, we described how a court would assess "whether the exposure of any given bystander to any particular supplier's product [would] be legally sufficient to permit a finding of substantial-factor causation," noting that:

> The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the *nature of the product, the frequency of its use, the proximity in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.*

*Balbos*, 326 Md. at 210, 604 A.2d at 460 (emphasis added and citations omitted). Relying on the *Balbos* "frequency, regularity, proximity" test, the Court of Special Appeals held that there was "more than enough circumstantial evidence to conclude that [Mr. Saville] performed a significant amount of work on Scapa's product ... [that Mr. Saville] was significantly exposed to Scapa's product ... and that [the jury] did not contradict itself when it found [Scapa] liable and the [c]ross-[d]efendants not liable." *Saville II*, 190 Md.App. at 345–48, 988 A.2d at 1067–68. Therefore, it upheld the trial court's denial of the motions, finding sufficient proffered evidence, when viewed in a light most favorable to Mr. Saville, to generate a jury question on causation. *Saville II*, 190 Md. App. at 345–48, 988 A.2d at 1067–68. Scapa asserts that "[t]he Court of Special Appeals's published opinion in *Saville II* stands for the proposition that a plaintiff in an asbestos product-liability case may reach the jury if he establishes the mere possibility of an undefined, unquantifiable exposure to asbestos[,]" and that the intermediate appellate court's holding "waters down" the *Balbos* test. We disagree.

Scapa raises five "evidentiary gaps," which it asserts were fatal to Mr. Saville's negligence claim and made it impossible that a jury could have determined that the alleged injuries

were caused by Scapa's dryer felts without resorting to "an untenable chain of speculative inferences," namely: (1) no evidence on the amount of time Mr. Saville spent on the machine where Scapa's dryer felts were installed; (2) no evidence on his proximity to the second position of machine number 9 ("No. 9 Machine") where Scapa's asbestos-containing felt indisputably ran; (3) no evidence on proximity of different machine positions to each other; (4) medical expert opinion testimony on the causation of Mr. Saville's mesothelioma based on "assumed facts that were never proven at trial;" and (5) no "discernable evidence" of the level of exposure to respirable asbestos fibers specifically caused by Scapa's felts.

### A. Evidence of exposure

■ When viewed in the light most favorable to Mr. Saville, however, the evidence that Mr. Saville regularly handled and/or worked in arm's length to Scapa's asbestos-containing felts on a daily basis for at least one year was legally sufficient to permit a jury question on proximate cause, and, therefore, the denials of Scapa's motions for judgment and JNOV were not in error.

The "frequency" prong of the *Balbos* test addresses the "frequency of use [of the product]" in the plaintiff's workplace. *Balbos*, 326 Md. at 210, 604 A.2d at 460 (stating "the factors to be evaluated include the nature of the product, the frequency of its use"). Scapa's witness, Ivan Fearnhead, testified that Scapa provided 75 felts to the Westvaco Mill between 1964 and 1978, which ran on the No. 8 and No. 9 paper machines and that two of those felts contained asbestos. Mr. Saville testified that he was employed in the Eight and Nine Machine Room Building of the Westvaco Mill from 1968 until 1978, with a brief hiatus for educational leave from 1974 until 1976. Additionally, according to master cards [3] kept by Scapa, and

---

3. Master cards were described in the testimony of former Scapa employee, Ivan Fearnhead. "A master card is a card that is kept at the manufacturing facility. And it's sort of like a recipe card. What it does is give the basic information for producing a type of felt for a particular mill paper machine and position on that paper machine.... So that

submitted to the jury as Plaintiff's exhibits, Scapa provided two asbestos-containing dryer felts which ran on the second position of the No. 9 Machine from October 1969 until November 1970. Scapa contends that Mr. Saville presented no evidence on the time that he spent between machines No. 8 and No. 9, and that because Scapa's asbestos-containing felts were only on No. 9, the jury could only speculate about the frequency of his exposure to those felts. There was circumstantial evidence, however, that Mr. Saville did work on machine No. 9 by way of Mr. Shoemaker's video testimony that as Mr. Saville's cohort he worked on machine No. 8 during the same shift as Mr. Saville, both of them being headquartered in the dryer sections of their respective machines. Frequency, therefore, was addressed directly by the testimony of Ivan Fearnhead, which linked Scapa to asbestos-containing felts at Westvaco; by the master cards that established, with particularity, where those felts ran; as well as a co-worker's testimony on the logistics of the maintenance work.

While not explicitly defined in *Balbos* or subsequent cases, regularity in the context of asbestos exposure indicates periodic exposure, i.e., something that happens at regular intervals. *Balbos*, 326 Md. at 213, 604 A.2d at 461 (involving a work-site where decedent was "covered regularly with asbestos dust"). Mr. Saville and co-worker, Mr. Shoemaker, testified that their duty as "broke-hustlers" [4] was to keep the six felts that ran on each of the No. 8 and No. 9 machines clean and running. Mr. Shoemaker testified that he scraped only on machine No. 8, leaving by reasonable inference, Mr. Saville scraped on machine No. 9 when the two were working on the same shift. Mr. Saville testified that at least once, and sometimes twice a day for about 10–20 minutes, the broke hustlers would scrape

---

when you come to make that felt again, you can make it the same way so that we get continuity of length."

4. The Fifth Circuit has stated that a broke hustler's "job was to gather nonsaleable trash paper from the machine and take it away for recycling." *Manville Forest Prod. v. United Paperworkers Intern.*, 831 F.2d 72, 73 (5th Cir.1987).

the dryer felts clean with a big blade while standing about an arm's length away from the moving felt.[5] Mr. Saville's testimony about the scraping process being "hot and dusty" was corroborated by Mr. Shoemaker's testimony that the scraped residue would "fly in the area" as opposed to building up on the surface of the scraping tool.[6] Mr. Saville and Mr. Shoemaker both testified that their work-sites were dusty from both the scraping and the blowing[7] of the felts. Testimony from Mr. Dennis Davidson, a former W & G employee, indicated that dust created from work on the asbestos-insulated pipes throughout the Eight and Nine Paper Machine Building would not be sucked through the ventilation system and would remain in the building, thus providing more circumstantial evidence that any dust containing asbestos fibers would remain in Mr. Saville's work-site. In addition, Mr. Saville testified that most of the scraping was done at the first section of the machine because that is where the sheet was the wettest and the "scale" or residue could be more easily scraped from the felt. Conflicting testimony was heard by the jury suggesting that the dryer felts would have to be changed, and therefore handled directly, every six months, but no less than every few years.

While our review of the record uncovered contradictory accounts of the "dustiness" of the atmosphere, bearing on the likelihood of the existence of respirable asbestos fibers, it is not the province of an appellate court to weigh the evidence

---

**5.** Mr. Shoemaker testified that five employees would collectively operate the blade used to scrape the felts. Mr. Shoemaker also testified that he did not scrape every shift, but only when the foreman said it was necessary to react to defects in the paper. Therefore, the evidence was not direct, but circumstantial, as to the regularity of exposure.

**6.** This testimony was contradicted by Scott Graham, a former employee at Westvaco, who testified that Mr. Saville's categorization of the dryer section as being "bone dry" was incorrect and that it was actually a very humid atmosphere.

**7.** Occasionally, the employees would use air hoses to more thoroughly clean the felts, which released particulate matter from the felts into the air.

because the trier of fact, i.e., "the jury and the jury only has the power to assess the weight of the evidence, a power which passes to the trial judge's discretion upon motion for a new trial." *Owens–Corning v. Garrett*, 343 Md. 500, 522, 682 A.2d 1143, 1153 (1996) (citing *Weissman v. Hokamp*, 171 Md. 197, 201, 188 A. 923, 925 (1937)). Collectively, the evidence presented supports Mr. Saville's periodic, i.e., regular, exposure to Scapa's asbestos-containing dryer felts and respirable asbestos fibers emanating from their upkeep, thus it was sufficient to warrant jury consideration.

The last prong of the *Balbos* test requires evidence of the proximity of the plaintiff, "in distance and in time," to the use of the product. *Balbos*, 326 Md. at 210, 604 A.2d at 460. Scapa contends that Mr. Saville presented no evidence that he was in the proximity of position two on the No. 9 machine, which is where the asbestos-containing dryer felts ran. Moreover, according to Scapa, Mr. Saville did not present evidence that positions one and two were in proximity to each other so that even if he was located in position one he would still be exposed to asbestos. The jury heard accounts of the size of the Eight and Nine Paper Machine Building from various witnesses, e.g., that is was the size of a city block, or a football field, or 150 yards, somewhere between three and five stories high, and 80 feet wide, while also hearing from Mr. Shoemaker that the broke hustlers worked in very close proximity, 10 to 30 feet away from one another. Therefore, while the (machine) building is very large, the work-site for each machine's broke hustler, i.e., the dryer sections of the No. 8 and No. 9 machines, were in relative proximity. Consequently, even if the evidence did show, through the master cards, that Scapa's asbestos-containing felts were only on the second section of the No. 9 machine, testimony from Scott Graham, in particular, indicated that the dryer cans upon which the felts ran were only a foot or a foot and a half apart. There is no direct evidence in the record of the precise distance between sections one and two of Machine No. 9. There is direct evidence, however, that Scapa's asbestos-containing dryer felts ran on section two of Machine No. 9 and circumstantial evidence that

Mr. Saville worked on Machine No. 9 primarily at section one. An inference may be reasonably drawn, therefore, about the proximity of Mr. Saville to the asbestos-containing dryer felt, which was on his machine, but in a different section.

Scapa contends that this collective evidence on frequency, regularity, and proximity was legally insufficient to require submission of the negligence case to the jury. Specifically, Scapa disagrees with the intermediate appellate court's application of its prior case, *Reiter v. ACandS*, 179 Md.App. 645, 947 A.2d 570 (2008), *aff'd sub nom., Reiter v. Pneumo Abex*, 417 Md. 57, 8 A.3d 725 (2010) to the instant case implying that if we affirm we will be endorsing the previously disavowed theories of "market-share" or "fiber drift" liability. We disagree.

▮ In *Reiter*, the widows of three deceased former employees of Bethlehem Steel Corporation's Sparrows Point facility appealed the decision of the Circuit Court for Baltimore City granting summary judgment in favor of Eaton Corporation, successor in interest to Cutler–Hammer, Inc, Pneumo Abex LLC, and Square D Company. The Court of Special Appeals and this Court affirmed that decision. The Court of Special Appeals held that the evidence and inferences, in a favorable light to the widows, would not permit a reasonable jury to conclude that the decedents' exposures to the companies' products were a substantial contributing cause of decedents' lung cancer. *Reiter*, 179 Md.App. at 662, 947 A.2d at 580. Specifically, relying on the requirements of the "frequency, regularity and proximity" test of *Balbos*, there was no evidence "identify[ing] the dust as having come from the wear of the crane brake linings," and the main witness could not "identify the suppliers of any brake linings used in the slab yard." *Reiter*, 179 Md.App. at 662–63, 947 A.2d at 580. As to one of the appellants, the intermediate appellate court noted that an inference on exposure "would be speculation at best ... without evidence linking his exposure to dust generated by the wear of Square D brake linings." *Reiter*, 179 Md.App. at 665, 947 A.2d at 582. The appellant's problem

in *Reiter* of linking a particular company's asbestos-containing products to the work-site of a claimant persisted on appeal to this Court, where we affirmed summary judgment holding that:

> Petitioners' evidence was sufficient to generate a jury issue on the question of whether (1) each decedent was exposed to asbestos dust at his workplace, and (2) Respondents manufactured some of the crane brake products used at the facility. We also conclude, however, that Petitioners' evidence was insufficient to establish that any of the Respondents' products were used at the *specific site(s)* where the Petitioners *actually worked.*

*Reiter v. Pneumo Abex,* 417 Md. at 61, 8 A.3d at 727–28 (concluding, for example, that "[e]vidence that some Square D products were used somewhere in the 480 acre tin mill does not establish that a Square–D product was on the crane that was in the 50 square feet where Mr. Reiter 'actually worked.' "). In addition to satisfying *Balbos,* a plaintiff must link the defendant to the product. *See Reiter v. ACandS,* 179 Md.App. at 665, 947 A.2d at 582 (citing *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 93 (1989)) ("Maryland courts apply traditional products liability law which requires the plaintiff to prove that the defendant manufactured the product which allegedly caused the injury.").

We affirm the intermediate appellate court's judgment on the trial court's rulings in the instant case, which is consistent with our recent decision in *Reiter,* quoted *supra.* There is more evidence in the instant case than there was in *Reiter,* that Scapa's asbestos-containing dryer felt frequently ran on a machine for which Mr. Saville was responsible for a particular kind of maintenance because it was used daily, at least for the period of one year, in proximity to Mr. Saville's workstation on the No. 9 machine, where he would periodically either directly handle the asbestos-containing felt or be exposed to dust emanating from the scraping and blowing clean-up procedures. The inferences that were found too speculative in *Reiter* do not arise in this case because of the amount of testimonial and circumstantial evidence placing the asbestos-

containing dryer felts within an arm's length of Mr. Saville's work-site.

■ At oral argument, before this Court, the parties were unsure whether the evidence of Mr. Saville's exposure to Scapa's asbestos-containing dryer felts was circumstantial or direct, a distinction that is immaterial because circumstantial evidence of exposure will suffice. *See Saville II*, 190 Md.App. at 345–46, 988 A.2d at 1067 (concluding that "there is more than enough circumstantial evidence to conclude that [Mr. Saville] performed a significant amount of work on Scapa's product."); *Balbos*, 326 Md. at 210, 604 A.2d at 460 ("Exposure, however, may be established circumstantially.") (citing *Roehling v. National Gypsum Co. Gold Bond Bldg. Products*, 786 F.2d 1225, 1228 (4th Cir.1986)) ("The evidence, circumstantial as it may be, need only establish that [plaintiff] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled."); *see also Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir.1986) ("To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.").

Our holding on this sufficiency of evidence question is not as emphatically stated as the Court of Special Appeals's holding because we conclude that the evidence was sufficient to survive the motions, but decline to state that the evidence "conclusively established" proximity as a matter of law. *C.f. Saville II*, 190 Md.App. at 346, 988 A.2d at 1067 ("Unlike *Reiter*, the evidence in this case conclusively established that plaintiff worked in close proximity to Scapa's asbestos-containing felt for a significant period of time, leaving him covered in dust."). Nonetheless, the Court of Special Appeals did not err in affirming the denial of Petitioner's motions for judgment and JNOV on Mr. Saville's claims, nor did that court misapply or misinterpret the rigors of the *Balbos* test.

## II. Procedural Issues with Cross-claims and Cross–Defendants

Scapa asks this Court to reverse the holding of the Court of Special Appeals, which affirmed the trial court's denial of Scapa's JNOV motion on its cross-claims against settling Co–Defendants, Westinghouse, Asten, and Albany. *Saville II,* 190 Md.App. at 351, 988 A.2d at 1070. The Court of Special Appeals held that Scapa did not comply with Md. Rule 2–532, requiring a motion for judgment prior to a motion for JNOV. The intermediate appellate court reasoned that because this Court's opinion in *GMC v. Seay,* 388 Md. 341, 879 A.2d 1049 (2005) requires strict compliance with Rule 2–532 and because Scapa did not prove that the stipulation entered into between the parties on the management of the cross-claims was an adequate substitute for a motion for judgment, the denial of the motion by the trial court would not be overturned. *Saville II,* 190 Md.App. at 350–51, 988 A.2d at 1070. The Court of Special Appeals noted that: "[e]ven if appellants were able to navigate around that mandate [that *GMC v. Seay,* 388 Md. 341, 879 A.2d 1049 (2005) requires strict compliance with Rule 2–532], they would have to demonstrate to our satisfaction that the rule's two 'fundamental purposes' were met by other means. The record before us does not support that contention." *Saville II,* 190 Md.App. at 350, 988 A.2d at 1070. Notwithstanding clever phrasing on Scapa's part,[8] this Court's

---

8. Scapa phrases its third issue as follows: "Did Scapa preserve its right to move for JNOV on its cross-claims where the trial court specifically advised defense counsel that 'anything else you may raise' is reserved for post-trial motions and the trial court subsequently confirmed that there was no waiver?" Scapa, therefore, presents a question of "waiver," based on the analysis of the Court of Special Appeals's determination that there were procedural defects in violation of Md. Rule 2–532. The record reveals, however, that the trial judge did not consider Scapa to have waived its right to move for JNOV and did not base his denial of the motion on a "waiver" argument. Therefore, the Court of Special Appeals's holding that "we are not willing to disturb the trial court's denial of that motion [for JNOV on the cross-claims,]" was right, but for the wrong reason. *Saville II,* 190 Md.App. at 351, 988 A.2d at 1070. The trial judge recognized that Mr. Saville opposed Scapa's JNOV on the cross-claims on procedural grounds, but noted that Scapa's position regarding the necessary procedural abnormalities of its cross-claims

task on this issue is, again, to determine whether the trial court erred in not granting Scapa's motion for JNOV on its cross-claims at the close of all the evidence.

■■■ Before the Court of Special Appeals, Scapa argued that "the evidence against the cross-defendants proved that [Mr. Saville] had more exposure to the cross-defendants' products than to Scapa's products, and that the jury's verdict [assessing liability against only Scapa and W & G] is therefore inconsistent and warrants a JNOV." *Saville II,* 190 Md.App. at 347, 988 A.2d at 1068. We iterate the summation of the intermediate appellate court:

> We review the trial court's decision to allow or deny judgment or JNOV to determine whether it was legally correct. Judgment as a matter of law is appropriate if all evidence and inferences permit only one consideration. If there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury.

*Saville II,* 190 Md.App. at 343, 988 A.2d at 1065–66 (internal citations omitted). The record indicates, and we have discussed *supra,* that there was sufficient evidence to deny Scapa's motions for judgment and JNOV on Mr. Saville's claims. Additionally, a review of the record indicates that there was sufficient evidence, when viewed in a light most favorable to the non-moving cross-defendants, to submit the issue of cross-defendants' liability to the jury. The trial judge's comments, *supra* footnote 8, indicate that he considered the merits of Scapa's JNOV motion, and ruled that there was sufficient evidence to support the jury's verdict that assessed no liability against the cross-defendants. Accordingly, we affirm that judgment.

---

against settling defendants was logical, therefore the trial judge did not deny Scapa's JNOV on procedural/ waiver grounds, but rather because it was difficult to separate out the evidence and the claims. The trial judge stated: "Where I end up getting in trouble is trying to distinguish between striking all the judgments because there's illogical inconsistency and granting your motion for judgments against third-party defendants...."

Scapa asserted cross-claims against all of the companies named in Mr. Saville's original suit. On January 18, 2008, Scapa filed, and W & G adopted, a "Motion for the Court to Adjudicate Cross Claims in Non–Jury Cross Claims Proceeding" drawing the trial court's attention to the tri-furcated trial conducted in the Circuit Court for Baltimore City, noting that the procedure was not condemned on appeal. *See MCIC, Inc. v. Zenobia,* 86 Md.App. 456, 484–93, 587 A.2d 531, 545–47 (1991), *rev'd in part on other grounds, Owens–Illinois, Inc. et al. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992) (affirming the trial court's ruling on cross-claims for contribution where the trial judge conducted a separate, non-jury cross-claims trial on liability and damages and relied chiefly on the trial record in granting all the cross-claims for contribution). Scapa argued in the motion that it intended to put on evidence in its case-in-chief against defendants who had previously settled with Mr. Saville: Westinghouse, Asten, Albany, Garlock, Inc., and Certainteed; as well as against the remaining non-settling co-defendant, W & G; and against defendants who were then in Bankruptcy, namely Celotex Asbestos Trust, Combustion Engineering Personal Injury Trust, Eagle Pitcher Industries Personal Injury Settlement Trust, H.K. Porter, Inc. Asbestos Trust, and Manville Personal Injury Settlement Trust. Scapa argued that the evidence would prove their joint tort-feasor status under the Maryland Uniform Contribution Among Joint TortFeasors Act, Md. Code, (1973, 2006 Repl. Vol.) §§ 3–1401–09 of the Courts and Judicial Proceedings Article ("Joint Tort-feasors Act").[9] The record does not indicate that the trial judge expressly ruled on Scapa's January 18th motion to adjudicate all cross-claim issues, of liability and damages, in a non-jury trial, but the trial judge did express reluctance at proceeding that way based on Md. Rule 2–325(e), which requires a jury trial as to all claims once elected by any party.[10]

**9.** Certainteed and Garlock do not appear in arguments presented to this Court, therefore, we do not reference those settling cross-defendants in this opinion.

**10.** Md. Rule 2–325 ("Jury trial.") (2011 Repl. Vol.) states in pertinent part:

Scapa's counsel argued that the cross-defendants had to be placed on the verdict sheet because if the jury found them to be liable for Mr. Saville's injuries, then there would necessarily be a pro rata reduction of any judgment according to the Joint Tort–Feasors Act. Scapa, Mr. Saville, and co-defendant W & G, agreed that the liability of the settling cross-defendants would have to be proven at trial because their releases with Mr. Saville had been executed without any admission of liability. The parties, however, did not agree on how to determine the cross-claim shares of any ultimate jury damage award. Ultimately, the parties resolved the impasse by stipulation, on January 23, 2008, stating:

The Parties are going to stipulate that Asten, Albany, or [and] Westinghouse go on the verdict forms as potential shares. There will be no judgment from the pleadings on them.

Scapa will put into evidence with respect to those—we are going to truncate what we are going to offer to Your Honor. And it will be verified interrogatories about them and some documents, but that we won't need to get into the issue of all these other coworker depositions.

Scapa argues to this Court that the stipulation meant that in exchange for truncating its cross-claim evidence, Mr. Saville would refrain from moving for judgment at the close of Scapa's case-in-chief on the cross-claims. The record indicates that the parties agreed that the shares of any awarded damages would be determined post-verdict by the court, with the assistance of counsel.

On January 24, 2008, Scapa presented the evidence on its cross-claims. It read into evidence: Answers to a Request for

(a) **Demand.** Any party may elect a trial by jury of any issue triable of right by a jury. . . .

\* \* \*

(e) **Effect of election.** When trial by jury has been elected by any party, the action, including all claims whether asserted by way of counterclaim, cross-claim or third-party claim, as to all parties, and as to all issues triable of right by a jury, shall be designated upon the docket as a jury trial.

Admissions by Carl Saville; deposition testimony of Mr. Green, former Westvaco employee; interrogatory answers from Carl Saville, Westinghouse, Asten, and Albany; and Answers to a Request for Admissions from W & G. In addition, W & G admitted into evidence excerpts from deposition testimony of Mr. Jack Smith, a former W & G employee. At the close of evidence on the cross-claims, which was the close of all the evidence, the following exchange took place:

[SCAPA'S COUNSEL]: Judge, we wanted to renew our motion—

THE COURT: Yes.

[SCAPA'S COUNSEL]:—motion and the testimony of our witnesses we believe shows that we should prevail, Judge.

THE COURT: All right. I'll deny the motion for both parties for the same—

[W & G'S COUNSEL]: And renew mine.

THE COURT: Wallace & Gale motions.

[SCAPA'S COUNSEL]: And we also have what we filed originally in the court—

THE COURT: Yes, for the same reasons on the same grounds and you'll reserve all those arguments for post-trial motions and anything else you may raise.

Neither party has presented argument to this Court, on specifically which motions were being addressed in this exchange. From our own investigation of the record, we conclude that the motion being renewed is necessarily Scapa's "Motion for Judgment at the close of Plaintiff's Evidence" filed on January 21, 2008. Moreover, because the parties and the trial court had previously agreed that apportionment of damages amongst any liable cross-defendants would be determined post-verdict, the later instruction by the trial court to "reserve all those arguments" logically references those contentions on the cross-claim shares, not cross-claim liability. Scapa has told this Court that the stipulation restricted Mr. Saville from moving for judgment on the cross-claims, but did not assert that it was so restricted. Given that all the parties agreed to a liability determination by the jury, and a post-

verdict determination of apportionment of damages, it does not appear that Scapa was precluded from moving for judgment on the cross-claims, and indeed it probably should have done so.

Scapa, and W & G by adoption of Scapa's motion, chose to bring cross-claims against certain co-defendants in Mr. Saville's case. When procedural rules, particularly Md. Rule 2–325 requiring a jury trial on all claims, threatened Scapa's desired outcome, namely that the cross-defendants would share in its potential liability, it stipulated to a jury trial on liability and a post-verdict resolution of potential cross-claim shares of any damage award. When the cross-defendants were found to be not liable and Scapa and W & G were found liable, Scapa moved for JNOV on Mr. Saville's claims, and in the alternative, Scapa moved for JNOV on the cross-claims. The motions were denied. The trial judge found that there was legally sufficient evidence supporting the verdict against Scapa. Accordingly, the trial judge denied the motion for JNOV as to the cross-claims, not because of a procedural violation of Md. Rule 2–532, which requires moving for judgment prior to moving for JNOV, but because the trial judge did not find a logical way to disrupt the jury's handling of the cross-claim evidence while upholding its treatment of Mr. Saville's evidence. Thus, we decline to reverse the trial court's ruling on Scapa's motion for JNOV on its cross-claims.

### III. Admissions

As part of its case against the settling cross-defendants, Westinghouse, Albany and Asten, as well as co-defendant W & G, Scapa read into evidence answers to its request for admissions ("admissions") served upon Mr. Saville. Before this Court, Scapa contends "that, if Mr. Saville's evidence was sufficient to support a verdict against Scapa, then Scapa's evidence against the cross-defendants required verdicts against the cross-defendants ... because the evidence presented in its case-in-chief on its cross-claims was uncontested and consisted almost entirely of admissions from Mr. Saville, particularly responses to formal requests for admissions."

The Court of Special Appeals held that the Mr. Saville's admissions were "merely statements of fact" and the "jury was *not* bound to accept that evidence as conclusive of liability, and therefore [the jury] did not contradict itself when it found [Scapa and W & G] liable and the Cross–Defendants not liable." *Saville II*, 190 Md.App. at 348, 988 A.2d at 1068 (emphasis added). Scapa requests that this Court "correct the Court of Special Appeals and clarify that [Mr. Saville's] Rule 2–424 admissions are, as provided for by the rule, 'conclusively established.' " Scapa is mistaken in its understanding of the effect of party admissions on its burden as cross-plaintiff in its suit against the cross-defendants and co-defendant. Accordingly, on this very narrow question relating only to the legal effect of Md. Rule 2–424 admissions, we affirm.

 Md. Rule 2–424 states in pertinent part:

(a) **Request for admission.** A party may serve one or more written requests to any other party for the admission of . . . (2) *the truth of any relevant matters of fact* set forth in the request.

*　　*　　*

(d) **Effect of admission.** Any matter admitted under this Rule is *conclusively established* unless the court on motion permits withdrawal or amendment.

Md. Rule 2–424(a), (d) (emphasis added). This Court has held that admissions must be conclusively binding in order to achieve the purpose of the rule, which is "to eliminate the need to prove factual matters at trial which the adversary cannot fairly contest," *Murnan v. Joseph J. Hock, Inc.*, 274 Md. 528, 534, 335 A.2d 104, 108 (1975), and to "avoid the necessity of preparation, and proof at the trial, of matters which either cannot be or are not disputed." *Mullan Co. v. International Corp.*, 220 Md. 248, 260, 151 A.2d 906, 913 (1959) (footnote omitted).

Scapa read into evidence approximately 40 selected excerpts from Mr. Saville's admissions as part of its case alleging joint tort-feasor liability against the cross-defendants: Westing-

house, Asten, and Albany and co-defendant W & G. Examples of such admissions include:

Both wet felts and dry felts were used during plaintiff's employment at the Westvaco paper mill.

Westinghouse turbines were used at the Westvaco paper mill during plaintiff's employment.

Installation and removal of the insulation from the Westinghouse turbines during plaintiff's employment created dust which contained respirable asbestos fiber.

Plaintiff was in the vicinity of workers installing and removing asbestos insulation materials from the Westinghouse turbines at the Westvaco paper mill.

Plaintiff inhaled dust caused by the installation and removal of insulation materials from the Westinghouse turbines.

The plaintiff was never warned about hazards from the installation and removal of asbestos insulation from the Westinghouse turbines.

There were no warnings on the Westinghouse turbines regarding the dangers of asbestos.

Once a dryer felt was removed form its packaging, plaintiff could not identify the manufacturer of the dryer felt.

Warnings were not placed on any dryer felts used at the Westvaco paper mill during the plaintiff's employment.

Plaintiff saw no warnings on any of the dryer felts used at the Westvaco paper mill during his employment.

The admissions, including those not excerpted here, addressed Westinghouse and W & G by name, while alluding to the asbestos-containing dryer felts produced and provided to Westvaco paper mill by cross-defendants Asten and Albany. Additionally, Scapa asked about exposure to dust containing respirable asbestos fibers from the installation and removal of pipe insulation and from the preparation of asbestos cement insulation.

Mr. Saville's admissions established conclusively that he was exposed to dust from Westinghouse's asbestos-containing product; however, whether that exposure was a substantial

cause of Mr. Saville's injury was a question for the trier of fact. This evidence differs from the evidence presented against Scapa, and additionally, fails to prove Westinghouse's liability as a matter of law because the admissions did not address how often the maintenance work on the turbines was performed thereby emitting respirable dust (frequency); or whether such maintenance was performed regularly. Even if we were to assume that Mr. Saville's admissions satisfy the proximity prong of the *Balbos* test, as a matter of law, the admissions did not likewise satisfy the frequency and regularity prongs. The admissions were also presented as evidence against Albany and Asten, producers of dryer felts. Unlike testimony and physical evidence regarding the Scapa dryer felts, Mr. Saville's admissions did not indicate whether or when the Albany or Asten dryer felts were installed on the No. 9 machine, where Mr. Saville was stationed. Those admissions, therefore, do not satisfy *Balbos* as a matter of law.

Here, Scapa asks us to hold that Mr. Saville's admissions established the cross-defendants's liability as a matter of law. Accordingly, Scapa concludes that its motion for JNOV on its cross-claims should have been granted. "A party is not entitled to judgment n.o.v. unless the facts and circumstances so considered are such as to permit of only one inference with regard to the issue presented." *Owens–Illinois v. Armstrong,* 326 Md. 107, 117, 604 A.2d 47, 52 (1992) (quoting *Impala Platinum v. Impala Sales,* 283 Md. 296, 327, 389 A.2d 887, 905 (1978)). Although the facts admitted did provide some evidence to support Scapa's cross-claims, they did not establish substantial factor causation under *Balbos,* as a matter of law, and they did not compel "only one inference." Therefore, the admissions were properly submitted to the jury for consideration as part of Scapa's case-in-chief against the cross-defendants and co-defendant. *See Wilson v. John Crane, Inc.,* 385 Md. 185, 201, 867 A.2d 1077, 1086 (2005) (holding that Rule 2–404 admissions were relevant to the merits of the claim against an asbestos-containing product manufacturer, but "petitioners at trial still had the burden of establishing that [the] asbestos-containing gaskets were a "substantial contributing

factor" "). Accordingly, the Court of Special Appeals correctly denominated Mr. Saville's admissions to be "statements of fact," and not, as Scapa suggests, conclusive evidence of liability.

Moreover, Scapa errs in its analogy to *MCIC, Inc. v. Zenobia,* a case wherein the Court of Special Appeals held that "answers [provided by cross-appellants] are admissions of exposure properly considered by the trial court in finding GAF liable for contribution as a joint tortfeasor in this case." *Zenobia,* 86 Md.App. at 486, 587 A.2d at 546. The intermediate appellate court went on to say that "evidence [admissions of exposure to GAF's products] was legally sufficient to support the trial court's determination that GAF was a joint tortfeasor liable for contribution...." *Zenobia,* 86 Md.App. at 488, 587 A.2d at 547. All that *Zenobia* stands for in this instance, is that uncontested factual matters, which are introduced into evidence through party admissions, are conclusively established. The jury, or the trial court in the case of *Zenobia,* was still required to weigh the evidence in light of prevailing law.

## IV. Treatment of § 524 Bankruptcy Trust Settlement Payments to Mr. Saville

At the commencement of Mr. Saville's original action numerous defendants entered bankruptcy. Several of those defendants settled with Mr. Saville. Pursuant to 11 U.S.C. § 524(g) of the Bankruptcy Code, a trust ("524(g) Trust") may be created to pay claims of personal injury caused by asbestos exposure in exchange for an injunction forestalling asbestos litigation.[11] *See e.g. Dartez v. Fibreboard Corp.,* 765 F.2d 456,

---

11. The Third Circuit described the evolution of trusts established pursuant to Federal Bankruptcy Code, 11 U.S.C. § 524(g) ("§ 524(g) Trusts"), stating:

In an effort "to grapple with a social, economic and legal crisis of national importance within the statutory framework of [C]hapter 11," the [New York] bankruptcy court oversaw the "largely consensual plan" leading to the establishment of a trust out of which all asbestos health-related claims were to be paid. *Id.* at 621. The trust was

474 (5th Cir.1985) (noting that "[11 U.S.C.] § 362(a)(6) of Bankruptcy code, which prohibits 'any act to assess a claim against the debtor' seems to prevent any determination in the current action of the percentage of liability attributable to [bankrupts] Johns–Manville and Unarco.") Scapa seeks to reduce the trial judgment by the amounts of payments made to Mr. Saville from such 524(g) Trusts by appealing to a tort-feasor's right of contribution enshrined in the Joint Tort-feasors Act; however, Scapa has not presented any analysis of how to apply the particular provisions of the Act to a § 524(g) Trust.[12] As it argued before the Court of Special Appeals,

"designed to satisfy the claims of all victims, whenever their disease manifest[ed]," (the "Manville Trust"). [*In the Matter of Johns–Manville Corp.*, 68 B.R.] 618 [ (Bankr.S.D.N.Y.1986) ], 628. . . . The Manville Trust was the basis for Congress's effort to deal with the problem of asbestos claims on a national basis, which it did by enacting § 524(g) of the Bankruptcy Code as part of the Bankruptcy Reform Act of 1994. *See* H.R.Rep. No. 103–835, at 40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348–49. *Section 524(g) authorizes courts "to enjoin entities from taking legal action for the purpose of . . . collecting, recovering, or receiving payment or recovery with respect to any [asbestos-related] claim or demand" through the establishment of a trust from which asbestos-related claims and demands are paid.* 11 U.S.C. § 524(g)(1)(B).

*In re Grossman's Inc.*, 607 F.3d 114, 126 (3d Cir.2010) (emphasis added).

12. Scapa suggests that an automatic off-set to its verdict would be consistent with how other state courts are handling § 524(g) Trusts. No appellate state court, however, has rendered an opinion about the proper handling of § 524(g) Trust settlement agreements in concert with state laws implementing the Uniform Contribution Among Joint Tort-feasors Act. Scapa cites to Case Management Orders created by the Circuit Court of Kanawha County, West Virginia, a state which has not adopted the Act, and several Courts of Common Pleas in Pennsylvania requiring disclosure of bankruptcy trust submissions and claim forms prior to trial. Given Scapa's decision not to challenge Mr. Saville's disclosures, or nondisclosures, under the Maryland Rules, these examples are irrelevant as they only evidence that trial courts have the authority to issue orders to manage efficient and timely discovery. Scapa also mischaracterized a federal district court case, *Lewin v. American Export Lines, Inc.*, 224 F.R.D. 389, 396 (N.D.Ohio 2004), in which a motion to compel an answer to an interrogatory concerning bankruptcy trust settlement payments was denied, but that court did conclude that if the jury found the defendant liable then it would compel production of the settlement information.

Scapa maintains that § 524(g) Trusts should be considered jointly and severally liable, as a matter of law, under the Joint Tort-feasors Act because a § 524(g) Trust payment is tantamount to an admission or concession of liability, and/or because a payment is the functional equivalent of an adjudication, and/or because public policy calls for prevention of gamesmanship and double recovery.

Being persuaded that there was not a full accounting of the § 524(g) Trust payments made to Mr. Saville during trial, and concluding that the judgment award of $1,684,415.00 should be reduced by any and all § 524(g) Trust payments that expressly require off-sets to a judgment, received up to and including the date of entry of the final judgment, April 30, 2008, we reverse the judgment of the Court of Special Appeals with direction to remand to the trial court for discovery of § 524(g) Trust settlement agreements so that the trial court can adjust the jury verdict appropriately.[13]

## A. Relevant Procedural History and Facts

The record extract indicates that Mr. Saville conceded that off-sets to the judgment are warranted, but only when expressly required by the § 524(g) Trust settlement agreements. According to the record, Scapa had a list of such § 524(g) Trust settlements at the time of the pre-trial hearing on January 7, 2008, during which the trial court addressed Scapa's "Motion in Limine for Declaration of Settled Parties and Entities, and Notice Confirming Intent to Seek "Settlement

---

13. In briefs to this Court, Scapa asserts that it is "entitled to discovery on all issues relating to the claims that Mr. Saville submitted to *any bankruptcy trusts and any resulting payments.*" Petitioner's Brief p. 27 (emphasis added). We held in *Bullinger*, that "the relevant portions of ... settlement agreements" reached between the Plaintiffs and the Manville trust and other settling joint tort-feasors, which were provided to the trial court *in camera*, were discoverable. *Porter Hayden v. Bullinger*, 350 Md. 452, 467, 713 A.2d 962, 969 (1998). We did not limit discovery to settling co-defendants. Therefore, it is equitable and consistent with our resolution of the *Bullinger* case, to order discovery of all § 524 Trust settlement payments, not just those made by entities who were at one time parties to the instant litigation.

Share" Reduction." [14] At that hearing, the following colloquy took place:

THE COURT: Okay. Motion in limine for declaration of settled parties.

\* \* \*

[SCAPA'S COUNSEL]: ... I understood that we had to file the motion up front requesting the declaration of settled parties and then requesting any kind of reduction in terms of a verdict.

THE COURT: How is that actually used? How is that dealt with?

[MR. SAVILLE'S COUNSEL]: We don't believe the settlement should be dealt with at all. If they put in evidence against other cross-defendants, then maybe they will overcome a motion for judgment to let the jury consider if they are joint tortfeasors, but we don't believe there should be any reference to settlement or anything that settlement or releases should have any affect in this trial.

[SCAPA'S COUNSEL]: Then maybe I misunderstand the procedure, Your Honor. I thought that I had to request the list of settled parties, which I do have, then I had to request up front and in advance of the trial the right to have a credit for those settlements *if I prove their share.*

For example, Aston (sic), which is also a dryer felt manufacturer, *if I prove* that their asbestos-containing dryer felts were a substantial contributing factor and they paid $100,000 to Mr. Saville, that I could, in the event of a plaintiffs verdict of a million dollars, argue about setoffs and credits.

[MR. SAVILLE'S COUNSEL]: As long as we are going to argue about that post-verdict, I can make any arguments then. . . .

---

14. On May 18, 2007, Scapa filed a "Motion in Limine for Declaration of Settled Parties and Entities, and Notice Confirming Intent to Seek "Settlement Share" Reduction." The motion was originally made in the *Beeman* May 9, 2006 Mesothelioma Consolidated Trial Group (Case No. 24x04001106); however the *Beeman* case was severed from the trial group prior to ruling on the motion.

THE COURT: This is a post-verdict.

[SCAPA'S COUNSEL]: I understood that part. Its post-verdict, but getting the list is pre-verdict.

THE COURT: All right. I've got you.

[SCAPA'S COUNSEL]: *I have the Saville list.*

THE COURT: Okay. That's fine. We'll deal with that post-verdict.

Therefore, the record indicates that, prior to trial, Scapa had at least some information relating to settlement agreements negotiated by Mr. Saville and disclosed § 524(g) Trusts.

Upon return of an unfavorable jury verdict, Scapa filed a "Motion for Judgment Notwithstanding the Verdict or in the Alternative For New Trial", including therein a request that the trial court "reduce the verdict amount [on a pro tanto [15] basis] by any and all settlements received by Plaintiff from any bankruptcy trusts for his alleged exposure to asbestos-containing materials" and order disclosure of documentation identifying amounts paid or owed to Mr. Saville. Subsequently, Scapa responded to Mr. Saville's "Motion for Entry of Judgment" claiming that no judgment should be entered until a full accounting of all payments by bankruptcy settlement trusts had been conducted, specially noting that Mr. Saville's Motion accounted for only two of the six trusts that Scapa had knowledge of at the time.

At the April 11, 2008 post-trial motions hearing, the trial judge considered Scapa's JNOV motion and Mr. Saville's "Motion for Entry of Judgment." Scapa's JNOV motion was denied, therefore no post-verdict discovery took place regarding the § 524 Trust(g) payments to Mr. Saville.[16] The trial

---

15. A pro tanto release directs a dollar-for-dollar reduction in a verdict award. *Garlock, Inc. v. Gallagher*, 149 Md.App. 189, 205–06, 814 A.2d 1007, 1016 (2003) ("The releases ... state that a dollar for dollar reduction be credited ... thus creating ... pro tanto releases.").

16. Scapa's request for a full accounting of settlement agreements and resulting payments is tantamount to a request for discovery, therefore

court entered a final judgment for Mr. Saville in the amount of $1,684.415.00, having reduced the jury verdict of $1,718,000.00 by the amounts of settlement payments that Mr. Saville received from three asbestos settlement trusts, which allegedly contained a provision requiring a dollar for dollar off-set from a jury award, including: $17,500.00 from the Manville settlement, $15,165.00 from the Celotex settlement, and $920.00 from the H.K. Porter settlement.[17] The judge did not off-set the verdict by other amounts that Scapa alleged had been paid to Mr. Saville, including: $20,000.00 from the Eagle Pitcher Industries Personal Injury Trust; $8,423.32 from the Combustion Engineering 524(g) Personal Injury Trust; and an unknown amount from the Haliburton/Harbison Walker Trust.[18]

The Court of Special Appeals held that "Scapa did not prove joint tort-feasor status of any claimed bankruptcy settlement trusts," which would be its burden if seeking contribution under the Joint Tort-feasors Act. *Saville II*, 190 Md.App. at

we find that the issue of treatment of the § 524(g) Trust payments is ripe for review because the trial court denied the request and entered judgment without permitting discovery to address the issue of additional off-sets. *See Stevenson v. State*, 180 Md.App. 440, 447, 951 A.2d 875, 879 (2008) ("Before this Court, appellant raises the same issue that she presented to the circuit court; therefore, despite the circuit court's avoidance of that issue, it is properly before us.") (citing Md. Rule 8–131(a) (generally, an appellate court will not decide issues not "raised in or decided by the trial court")).

17. In his "Motion for Entry of Judgment" filed January 31, 2008, Mr. Saville argued that the verdict was subject to reductions in the amounts of $17,500.00 from the Manville Settlement and $7,583.00 from the Celotex Settlement. In his proposed amended order, Mr. Saville corrected two mistakes in its first proposed order, increasing the off-set amounts for the Celotex settlement by $7,582.00 for a total of $15,165.00 and adding H.K. Porter Trust in the amount of $920.00.

18. Scapa specifically requested reductions from: the Celotex Asbestos Trust in the amount of $67,100.00; Eagle Pitcher Industries Personal Injury Trust for $20,000.00; Combustion Engineering 524(g) Personal Injury Trust for $8,423.32; H.K. Porter, Inc. Asbestos Trust for $920.00; Haliburton/Harbison Walker (noting unknown settlement amount due to a redacted release form provided by Mr. Saville); and the Johns Manville Personal Injury Settlement Trust for $17,500.00.

353, 988 A.2d at 1071. Moreover, the intermediate appellate court held that "[t]he judgment in this case was reduced to account for three bankruptcy settlements, upon [Mr. Saville's] motion to amend the judgment, but the [trial] judge had no evidentiary basis upon which to grant appellant's motion to reduce the judgment for the bankruptcy trust payments." *Saville II*, 190 Md.App. at 353, 988 A.2d at 1071.[19] Scapa pled in its motion for JNOV that additional § 524(g) Trust settlement payments had been made to Mr. Saville, but the record on appeal does not indicate if those agreements were presented to the trial court. Therefore, the Court of Special Appeals is technically correct that the trial judge did not have evidence upon which to base further reductions, however, post-verdict discovery would be necessary and appropriate in order to procure that evidence because "once the verdicts were rendered against petitioners, the amounts of the settlement agreements became relevant in determining the apportionment of damages as to petitioners under the Maryland Uniform Contribution Among Joint Tort-feasors Act." *Porter Hayden v. Bullinger*, 350 Md. 452, 461, 713 A.2d 962, 966 (1998) (a case in which we remanded the issue of apportionment of damages to the trial court because it was a factual determination).

**B. Section 524(g) Trusts and the Joint Tort-feasors Act**

As noted *supra*, a § 524(g) Trust established pursuant to Federal Bankruptcy Code, 11 U.S.C. § 524(g), is statutorily protected from suit. Therefore, in order to obtain automatic off-sets to the judgment rendered against it, Scapa maintains that it cannot sue those entities for contribution and instead

---

**19.** Specifically, the Court of Special Appeals noted a lack of evidence stating:

> Scapa claimed that [Mr. Saville] received payments from Eagle Picher Industries Personal Trust, the Combustion Engineering 524(g) Personal Injury Trust, and the Halliburton bankruptcy trust. However, Scapa did not introduce evidence of their distribution procedures, nor is there any evidence on the record that [Mr. Saville] actually received the payments alleged.

*Saville II,* 190 Md.App. at 353, 988 A.2d at 1071.

asks that we analogize the establishment of joint tort-feasor status through judicial determination, adjudication, by admission, or default judgment to the establishment of a Trust and payments of trust monies to asbestos claimants. *See* 11 U.S.C. § 524(g)(1)(B).

The "statutory prerequisites" for establishing a § 524 Trust are outlined in 11 U.S.C. § 524(g)(2)(B)(i)(I), (ii)(I-III): the debtor must have been "named in an action for damages allegedly caused by asbestos," and be "subject to substantial demands for payment in the future . . . [additionally] permitting the pursuit of such claims outside the trust mechanism would threaten the plan's attempts to deal equitably with current and future demands." 11 U.S.C. § 524(g)(2)(B)(i)(I), (ii)(I-III).

> The trust itself must also satisfy certain standards under § 524(g) in order to qualify for the issuance of a channeling injunction directing all future claims to the trust: the *trust must assume the liabilities of the debtor* for current and future claims and must be funded at least in part by the securities of the debtor; the trust must either own, or be entitled to own, the majority of the voting shares of the debtor, its parent, or its subsidiary; the *trust must use its assets to pay future claims and demands;* and the trust must provide for mechanisms ensuring its ability to value and pay present and future claimants in substantially the same manner.

*In re Combustion Engineering, Inc.,* 391 F.3d 190, 234 n. 45 (3d Cir.2005) (emphasis added) (citing 11 U.S.C. § 524(g)(2)(B)(i)(I)-(IV), (ii)(V)). In light of the § 524(g) Trust characteristics, Scapa asserts that because the Trust must "assume the liabilities" of the asbestos-manufacturer, that the manufacturer can only establish such a Trust after having been threatened with suit, or actually sued, and that the Trust money must be used to pay claims, that general liability under the Joint Tort-feasors Act is established by the fact of the creation of the Trust and payment of settlement. We disagree.

■ Under the Act, joint tort-feasors are "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Joint Tort-feasors Act, § 3–1401(c). One purpose of the Joint Tort-feasors Act is to "try in one action all phases of the litigation," *Bullinger*, 350 Md. at 473, 713 A.2d at 972, and to "prevent double recovery," *Hollingsworth v. Connor*, 136 Md.App. 91, 139, 764 A.2d 318, 344 (2000) (quoting *Owens–Illinois, Inc. v. Armstrong*, 326 Md. 107, 126, 604 A.2d 47, 56 (1992)). Liability arising because of joint tort-feasor status and the consequential impact of a release of such a tort-feasor was aptly surveyed by the Court of Special Appeals in *Jacobs:*

> As the Court of Appeals recognized long ago, "the Act does not specify the test of liability. Clearly, something short of an actual judgment will suffice." *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428 (1957). The fact, however, that a party has been sued or threatened with suit is not enough to establish joint tort-feasor status. *See Owens–Corning Fiberglas, Inc. [Corp.] v. Garrett*, 343 Md. 500, 531–32, 682 A.2d 1143 (1996). Tort-feasor status, in the absence of adjudication, generally rests on admission by the purported tort-feasor of such status. Thus, a party will be considered a joint tort-feasor when it admits joint tort-feasor status in a settlement agreement, *see Martinez*, 300 Md. at 94–95, 476 A.2d 197, or if a default judgment has been entered against a party. *See Porter Hayden Co. v. Bullinger*, 350 Md. 452, 473–74, 713 A.2d 962 (1998) (because a default judgment is considered an admission of liability, it is sufficient to establish joint tort-feasor status). One will not be considered a joint tortfeasor, however, merely because he or she enters a settlement and pays money. *See Garrett*, 343 Md. at 532, 682 A.2d 1143. Where the settling parties specify in the release that the settling party shall not be considered a joint tort-feasor, monies paid on account of such settlement will be considered merely volunteer payments; a non-settling defendant judicially determined to be liable will not be entitled to a reduction of the damages awarded against it on

account of the consideration paid by the settling party. *See id.* at 531–33 [682 A.2d 1143]; *Collier v. Eagle Pitcher [Eagle–Picher]* *Indus., Inc.,* 86 Md.App. 38, 57, 585 A.2d 256, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991).

*Jacobs,* 131 Md.App. at 374–75, 749 A.2d at 191 (2000); *see also Hashmi v. Bennett,* 416 Md. 707, 726–27, 7 A.3d 1059, 1071 (2010) (noting that "[n]ever has this Court . . . permitted . . . "judicial determination" of joint tort-feasor status, without their having been joined as original defendants or as third parties.") (footnote omitted). Scapa has not persuaded this Court that deviation from prior cases that address the methods for establishing joint tortfeasor status, is warranted. Thus, in accordance with our settled case law, the establishment of a § 524(g) Trust does not amount to an adjudication, nor does it suffice as an admission of liability to the claimant, nor is it analogous to a default judgment. Consequently, Scapa must rely on the language of the settlement agreements to determine whether the Trust may be treated as a joint tortfeasor for the purposes of an off-set to a judgment.

### C. *Bullinger* : Discoverable, Relevant Releases

 Scapa argues that under *Bullinger,* it is entitled to post-verdict, pre-judgment discovery on the amounts that Mr. Saville received from any and all § 524(g) Trusts and that a subsequent reduction in the jury award must be effectuated as a matter of law regardless of the language of the settlement agreements. Mr. Saville claims, however, that because the § 524 Trust settlement agreements individually address whether or not their payments to the claimant should impact a subsequent judgment won by the claimant in court against a non-bankrupt / non-settling defendant, that the only discoverable trust payments from Celotex, H.K. Porter and Manville were already disclosed and accounted. *Bullinger* establishes that § 524(g) Trust settlement agreements and payment amounts are discoverable and that the provisions in such agreements govern whether off-sets should be made to a verdict.

In 1995, numerous plaintiffs filed suit in the Circuit Court for Baltimore City alleging that exposure from the products of Owens Corning Fiberglas Corporation, Porter Hayden Company (*"Bullinger* Petitioners"), and numerous others caused them to contract asbestos-related mesothelioma. Upon a return of a favorable jury verdict the plaintiffs "provided information to the trial court for *in camera* consideration regarding settlements with the Manville Trust and with other settling joint tort-feasors." *Bullinger,* 350 Md. at 458, 713 A.2d at 964. The trial court denied the *Bullinger* Petitioners's requests to consult the settlement information and the Court of Special Appeals held that those amounts were properly withheld. We disagreed. We held that "the trial court erred in refusing to allow petitioners to inspect the amounts of the settlement agreements," and we vacated the judgment "as to the apportionment of liability." *Bullinger,* 350 Md. at 459, 713 A.2d at 965. On remand, we directed the Circuit Court for Baltimore City to "apply the preclusive effect of . . . [the] federal court action in *Manville VI [In re Joint E. & S. Dists. Asbestos Litig.,* 929 F.Supp. 1, 9 (E.D.N.Y. & S.D.N.Y.1996) ]", which would pre-date the trial court's apportionment determination on remand. *Bullinger,* 350 Md. at 459, 713 A.2d at 965.

In *Manville VI,* the federal district court predicted that "the Maryland Court of Appeals would exclude the Trust in determining the number and size of pro rata shares and would credit amounts settled by the Trust to defendants adjudicated joint tortfeasors who have not already settled." [20] *Manville*

---

**20.** In the case, *In re Joint E. & S. Dists. Asbestos Litig.,* 929 F.Supp. 1, 9 (E.D.N.Y. & S.D.N.Y.1996) *("Manville VI"),* the federal district court for the Eastern and Southern Districts of New York, analyzed "how the Maryland Court of Appeals would apply 'Maryland set-off principles . . . in the context of the present Settlement[,]' " stating:

> In cases tried to verdict, the [Manville] Trust shall not be counted as a joint tortfeasor in calculating the value of the statutory *pro rata* shares of the verdict. If the plaintiff has settled his or her claim with the [Manville] Trust at or before the time judgment is entered, the judgment against any non-settling tortfeasors shall be reduced by the amount of the settlement. Where there is more than one such non-

*VI*, 929 F.Supp. at 4. In light of the substantive conclusion reached by the federal district court while interpreting Maryland law, this Court, in *Bullinger*, precluded the Maryland litigants and the Manville Trust from re-litigating the issue of apportionment of damages and directed the Maryland trial court to adopt the apportionment determination explained by the federal district court. Our holding in *Bullinger*, therefore resolved treatment of the provisions of a specific Trust, which expressly required that local law be applied to the determination of off-sets.

In *Bullinger*, we directed the trial court to permit post-verdict discovery of "the negotiated settlements [that] may have been irrelevant in the pre-trial stage," but became relevant to the determination of apportionment of damages under the Joint Tort-feasors Act "once the verdicts were rendered against petitioners." *Bullinger*, 350 Md. at 461, 713 A.2d at 966. Concluding that "[t]he sums and certain of the conditions of the settlements ... are relevant and discoverable," we specifically stated:

> Petitioners had a "need to inspect" so much of the settlement agreement as was relevant to a determination of whether, and how much, the judgments against them might be affected by (1) the way in which the agreement classified the settling defendant, *i.e.*, tort-feasor or non tort-feasor, (2) whether a pro tanto or pro rata release was intended, and (3) the amount paid for the release.

*Bullinger*, 350 Md. at 468–69, 713 A.2d at 970; *see* Md. Rule 2–402(a) (permitting discovery of any matter, not privileged that is relevant to the action).

 "Under the Act, a non-settling joint tort-feasor is entitled to a reduction on a claim against it when the plaintiff has entered into a release with a joint tort-feasor." *Bullinger*, 350 Md. at 469, 713 A.2d at 970. In lieu of litigation, a § 524(g) Trust may enter into a negotiated settlement agree-

---

settling tortfeasor, they shall share the benefit of such reduction on a *pro rata* basis.

*Manville VI*, 929 F.Supp. at 9.

ment with an individual claimant or class of claimants with the intention of discharging any alleged liability for asbestos-related personal injury. Such an agreement may address the liability of the bankrupt company, in general, or in specific as relevant to potential litigation between the settling claimant and third parties. For instance, the Manville Trust, stipulated to the Trust's tort-feasor status, stating: "The Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof." *See Bullinger*, 350 Md. at 471, 713 A.2d at 971 ("The release between the plaintiff and the settling defendant may provide that the settling defendant, is, or is considered, a joint tort-feasor, in which case the nonsettling defendant is entitled to a reduction in the verdict.") (citing *Martinez v. Lopez*, 300 Md. 91, 94–95, 476 A.2d 197, 198–99 (1984)); *see also Jones v. Hurst*, 54 Md.App. 607, 610–11, 459 A.2d 219, 221–22 (1983) (involving an express denial of liability coupled with language in the release stating that the settling defendant would be considered a joint tort-feasor "to the same extent and effect as if judgments had been rendered against them (sic) as joint tort-feasors (sic).").

In the instant case, the substance of the settlement agreements between Mr. Saville and any and all § 524(g) Trusts will determine the amount of the reduction of the judgment.[21] Accordingly, we rely upon our holding in *Bullinger* and direct that on remand to the Circuit Court for Baltimore City, the court should: (1) permit discovery for all settlement agreements between Mr. Saville and § 524(g) Trusts; (2) and reduce the judgment according to the manner explained *infra*, noting that denials of liability with no provisions for treatment of the Trust as a joint tort-feasor will result in no off-set for that particular Trust, just as analogous releases would be treated under the Joint Tort-feasors Act.

---

21. We make no comment about the status of the settlement payments made to Mr. Saville pursuant to release agreements with (adjudicated non-tort-feasor) cross-defendants: Westinghouse, Albany, and Asten because Scapa has only appealed specifically the issue of reduction of the judgment to account for payments from § 524(g) Trusts.

534

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. . COSTS TO BE PAID 75% BY PETITIONER AND 25% BY RESPONDENT.

