Tyson Farms, Inc., et al. v. Uninsured Employers' Fund, No. 5, September Term, 2020

**WORKERS' COMPENSATION – DETERMINATION OF EMPLOYER-EMPLOYEE RELATIONSHIP – CO-EMPLOYMENT –** Court of Appeals held that Court of Special Appeals erred in concluding, as a matter of law, that chicken farm owner and company that provided chickens were co-employers of farm worker at time that he was injured and erred in reversing trial court's judgment. Court of Appeals determined that trial court properly denied motion for judgment, as evidence adduced at trial was susceptible to differing reasonable inferences, including inference that company did not exercise control over worker necessary to be deemed co-employer and thus was not co-employer of worker. Court of Appeals concluded that there was sufficient evidence from which reasonable juror could find—as jury did—that company was not co-employer of worker.

Circuit Court for Worcester County
Case No. 23-C-16-000233

Argued: October 5, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 5

September Term, 2020
_____

TYSON FARMS, INC., ET AL.

v.

UNINSURED EMPLOYERS' FUND
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.
_____

Opinion by Watts, J.
McDonald, J., dissents.
_____

Filed: November 20, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case involves the question of whether an injured worker who is an employee of a chicken farm is also the employee of a company that through a contractual relationship with the owner of the farm furnishes chickens, feed, and other supplies, and instructions as to how to produce/grow the chickens. Stated otherwise, the issue concerns whether the owner of a chicken farm and the company that provides the chickens to be raised and ultimately retrieves/buys them from the farm owner are co-employers of a farm worker. More broadly, the case pertains to "employee" status in the workplace. This Court has recognized that "[a] worker may simultaneously be the employee of two employers." Whitehead v. Safway Steel Prod., Inc., 304 Md. 67, 79, 497 A.2d 803, 809 (1985) (citation omitted). To determine whether an employer-employee relationship exists, this Court has established the following five factors: "(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer." Mackall v. Zayre Corp., 293 Md. 221, 230, 443 A.2d 98, 103 (1982). The most important factor in that determination, and indeed the decisive one, is the factor of control. See id. at 230, 443 A.2d at 103. Ordinarily, the question of whether an employer-employee relationship exists is for the jury to determine. See id. at 230, 443 A.2d at 103. And, significantly, where the evidence supports an inference that more than one individual or company controls a person in the performance of a given duty, "the question of whether an employer-employee relationship exists is a question of fact to be determined by the jury." Id. at 230, 443 A.2d at 103 (citations omitted).

In this case, Mauro Jimenez Garcia[1] sustained an occupational disease of the lungs while working and residing on a chicken farm in Worcester County, Maryland, owned by Dai K. Nguyen, Ind. t/a TN, LLC.[2] The chickens on the farm were raised for, and owned by, Tyson Farms, Inc., Petitioner. Pursuant to the Maryland Workers' Compensation Act, Md. Code Ann., Lab. & Empl. (1991, 2016 Repl. Vol.) ("LE") §§ 9-101 to 9-1201, Garcia filed a claim with the Workers' Compensation Commission against Nguyen. Because Nguyen did not have workers' compensation insurance, the Uninsured Employers' Fund ("UEF"), Respondent,[3] became involved in the claim. Subsequently, Garcia and UEF impleaded Tyson into the claim. Following a hearing, the Commission issued an award of compensation, determining that Garcia was a covered employee who sustained an occupational disease arising out of and in the course of his employment and that Nguyen and Tyson were co-employers of Garcia.

Tyson sought judicial review in the Circuit Court for Worcester County and requested a jury trial. The circuit court conducted a two-day jury trial, at which the sole issue was whether Tyson was a co-employer of Garcia. After the conclusion of the evidence in the case, both UEF and Tyson moved for judgment. The circuit court denied the motions. The jury returned a verdict in favor of Tyson, finding that Tyson was not

---

[1]Garcia is listed as a petitioner in this case.

[2]Nguyen owned two adjacent farms, the Carrera Farm and the Cayenne Farm (collectively, "the farm").

[3]Pursuant to LE § 9-1002, the purpose of UEF is "benevolent and remedial, that being to protect injured workers whose employers failed, either willfully or negligently, to carry workers' compensation insurance for them." W.M. Schlosser Co. v. Uninsured Employers' Fund, 414 Md. 195, 210-11, 994 A.2d 956, 965 (2010) (cleaned up).

Garcia's co-employer.

UEF noted an appeal, raising a single question for review—whether the circuit court erred in denying its motion for judgment. In a reported opinion, a majority of a panel of the Court of Special Appeals reversed the circuit court's judgment, determining that no reasonable inference could be drawn from the evidence other than that Tyson was Garcia's co-employer. See Uninsured Employers' Fund v. Tyson Farms, Inc., 243 Md. App. 406, 422, 220 A.3d 429, 438-39 (2019). The Court of Special Appeals concluded that "Tyson's control over [] Garcia's work was more than sufficient to establish an employment relationship as a matter of law[,]" reasoning that "Tyson's extensive involvement in, and control over, [] Garcia's day-to-day operation of the farm gave rise to an employment relationship as a matter of law." Id. at 416, 417, 220 A.3d at 435, 436. The Honorable Steven B. Gould dissented and stated that, "[i]n [his] view, there are sufficient facts in the record to allow a reasonable jury to determine, as it in fact did here, that Tyson was not [] Garcia's co-employer." Id. at 422, 220 A.3d at 439 (Gould, J., dissenting).

Against this backdrop, we must decide whether the Court of Special Appeals was correct in concluding that no reasonable inference could be drawn from the evidence presented at trial other than that an employment relationship existed between Tyson and Garcia and that the evidence established the employment relationship as a matter of law. We hold that the Court of Special Appeals erred in concluding that the evidence was sufficient to establish that Tyson was Garcia's co-employer as a matter of law and in reversing the circuit court's judgment. Like Judge Gould, we conclude that there was sufficient evidence from which a reasonable jury could find—as it did—that Tyson was

not a co-employer of Garcia. The circuit court properly denied UEF's motion for judgment, as the evidence adduced at trial was susceptible to differing reasonable inferences, including the inference that Tyson did not exercise the control over Garcia necessary to be deemed a co-employer. Accordingly, we reverse the judgment of the Court of Special Appeals.

## BACKGROUND

On June 27, 2014, Garcia filed a claim with the Commission against Nguyen. On the claim form, Garcia identified his work as a "chicken[ ]house tender" and stated that his occupational disease occurred by "[b]reathing dust, chemicals and ammonia in [the] chicken[ ]house[, s]pen[ding] 7-10 hours per day six days per week[, p]oor ventilation." It became clear that Nguyen was an uninsured employer, *i.e.*, Nguyen did not carry workers' compensation insurance, and UEF was added as a party. Both Garcia and UEF filed requests to implead Tyson, a self-insured employer, and Tyson was added as a party to the claim.

The Commission held a hearing and thereafter issued an award of compensation, determining that Garcia was a covered employee who sustained an occupational disease of

hypersensitivity pneumonitis[4] and interstitial disease[5] arising out of and in the course of his employment.  The Commission found that both Nguyen and Tyson were co-employers of Garcia at the time of his occupational disease.  The Commission ordered Nguyen and Tyson to pay for Garcia's "causally related medical expenses" and to pay compensation for temporary total disability.

Tyson filed in the circuit court a petition for judicial review, contending, among other things, that the Commission erroneously found that the company was a co-employer and jointly and severally liable with Nguyen for payment of benefits and medical expenses. Tyson requested a jury trial.[6]  On June 19 and 20, 2018, the circuit court conducted a jury trial.  The sole issue before the jury was whether Tyson was a co-employer of Garcia.  At

---

[4]Stedman's Medical Dictionary defines "hypersensitivity pneumonitis" as:

> [A] chronic progressive form of pneumonia with wheezing, dyspnea, and diffuse infiltrates seen on radiographs; occurs following exposure to any of a variety of antigens, sometimes occupational, and many names are given to cases with known types of exposure (such as farmer's lung, maple bark stripper's lung, chicken plucker's lung, bagassosis, byssinosis, and humidifier lung); biopsy findings usually show patchy infiltration of alveolar walls with lymphocytes, plasma cells, and other inflammatory cells; can progress to irreversible interstitial fibrotic disease with restrictive pattern on pulmonary function, but in early disease most manifestations are reversible if offending antigen is identified and removed from environment.

*Hypersensitivity Pneumonitis*, Stedman's Medical Dictionary (Westlaw database updated Nov. 2014).

[5]"Interstitial disease" is "a disease occurring chiefly in the connective-tissue framework of an organ." *Interstitial Disease*, Stedman's Medical Dictionary.

[6]While the case was pending in the circuit court, on April 19, 2018, the Commission held a hearing and, on April 24, 2018, issued an order in which it determined that a double lung transplant recommended by the University of Maryland was reasonable and necessary, and ordered Nguyen and Tyson to provide "authorization for the surgery and appropriate follow up care as directed by the transplant team[.]"

trial, the following evidence was adduced.

Tyson is said to be the largest chicken company in the world and sells chicken but does not own any chicken farms. Instead, Tyson contracts with individual farmers, in Maryland, Delaware, Virginia, and elsewhere, to raise chickens that it owns. The farm owners operate the farms, and the chickens are raised in flocks according to Tyson's guidelines. The owners may manage the farms themselves or employ workers, sometimes called managers, who are responsible for the day-to-day operation of the farms. The end goal is for Tyson to retrieve the chickens from the farm owners for a price and have them ready for sale as food to the public.

In 2009, Garcia began working on the subject chicken farm. He was hired by Terry Ung ("Mr. Ung"), who was the owner and manager of the farm at the time and was raising chickens for Tyson. When Garcia was hired, he took care of chickens and performed miscellaneous work and routine maintenance, such as removing dead chickens, doing yardwork, changing lightbulbs, and fixing doors. Mr. Ung became ill and had to undergo lung surgery, and Garcia began managing the farm. At the end of 2009, Mr. Ung died and his widow, Lee Ung ("Ms. Ung"), who had no experience raising chickens, became the owner of the farm.

Because of Ms. Ung's lack of experience in raising chickens, Tyson representatives taught Garcia how to operate the farm. Garcia assumed day-to-day responsibility for the chickens and began residing at the farm. A few years later, in 2013, Ms. Ung sold the farm to Nguyen, who entered into a contract with Tyson. Nguyen worked in information technology in Virginia at the time, where he resided, and purchased the farm as an

investment. Nguyen had no experience or training in raising chickens or operating a chicken farm. Nguyen kept Garcia on to manage the farm.

As a witness for Tyson, Ronald Watkins, senior manager of live production for Tyson, testified about Tyson's relationship with chicken farms and its contract. Watkins testified that the subject contract is a standard contract that outlines Tyson's obligations. Watkins testified that, under the contract, the owner/grower, Nguyen, is expected to provide housing for the chickens and the day-to-day husbandry or operation of the farm using technical advice from Tyson. Watkins testified that, under the contract, the owner/grower of the chickens is not considered an employee of Tyson and that this is specified in the contract. According to Watkins, under an owner's contract with Tyson, Tyson is not involved in the hiring of workers on a farm and does not have the right to fire workers on a farm. Watkins testified that Tyson also does not have the right to set the hours for farm workers; rather, the workers' hours are controlled by the farm's owner. Watkins testified that Tyson has the right to terminate a contract if certain conditions are not met, such as if there is evidence that the health or welfare of the chickens has been endangered or Tyson's feed or medication schedule has been altered or supplemented. According to Watkins, in the case of an absentee owner—someone who owns, but does not live on, a farm—Tyson "like[s] to have" someone reside at the farm 24 hours a day, 7 days a week for the general operation of the farm and to respond if problems occur.

On cross-examination, Watkins confirmed that in the contract the chickens are referred to as broilers and that there is a "Broiler Growing Guide" that sets forth best management practices that the owner of the farm is expected to follow. Watkins testified

- 7 -

that if an owner does not "follow the programs and it leads to animal welfare issues or poor performance," Tyson could terminate the contract.

The contracts memorializing the relationship between Tyson and Nguyen are titled "Broiler Production Contract[s]" and encompass two farms with the same address—the Carrera Farm and the Cayenne Farm—and were admitted into evidence as Joint Exhibits 4 and 5.[7] The terms of the two contracts were identical and both were signed on June 13, 2013. Under the contracts, Tyson retained title to and ownership of the chickens, feed, and medication, as well as the authority to determine the details of delivery to and pick-up from Nguyen of the chickens, feed, and medication. Tyson was required to provide veterinary services and technical advice and to comply with all applicable statutes, rules, regulations, and ordinances. As the "producer," *i.e.*, farm owner, Nguyen was required: to "furnish labor, materials, and utilities"; to maintain bio-secure housing for the chickens, feed, and medication; to implement Tyson's "recommended best animal management practices"; and to comply with all applicable statutes, rules, regulations, and ordinances. Consistent with Watkins's testimony, under the contracts, Nguyen was identified as an independent contractor: "Producer is engaged in and is exercising independent employment. Producer is an independent contractor and may join any organization or association of Producer's choice. Producer is not a partner, agent, or employee of, or joint venturer with," Tyson. Other than providing that Nguyen, as the producer, was required to furnish labor, the

---

[7]Joint Exhibit 4 contained the contract for the Carrera Farm, as well as a Schedule A and a Schedule B. Joint Exhibit 5 contained the contract for the Cayenne Farm, as well as a Schedule A and a Broiler Growing Guide. Both contracts and Schedules A and B were signed and dated by the parties. The Broiler Growing Guide was neither signed nor dated.

contracts did not reference Garcia specifically or require that Garcia or anyone else live on the farm as an employee. The contracts also did not make any provision for the payment of labor by Tyson.

Under the contracts, Tyson had the right to terminate the contracts upon default by Nguyen, which included a failure to comply with any contractual provision. In the event of a default, Tyson could take immediate possession of the chickens, feed, and medication without further notice and use Nguyen's houses containing its chickens to complete the production of the chickens at his expense. Nguyen also had the right to terminate the contracts "at any time with no less than ninety (90) days written notice." Additionally, the contracts contained a paragraph entitled "Entire Agreement" that provided:

> This Contract, including the attached Schedules, contains the entire agreement between Producer and Company regarding the production of Broilers. This Contract supersedes all prior agreements between Producer and Company. Producer understands and agrees that no agent, servant, or employee of Company has authority to make any oral modification of this Contract. Modification of this Contract may only be accomplished by written Instrument fully executed by Producer and an authorized representative of Company.

(Cleaned up). Schedule A concerned how Nguyen was to be compensated for the production of the broiler chickens and set forth a formula for compensation based on the weight of the chickens. Schedule B pertained to performance requirements for the producers/owners and housing specifications for the broilers.

As a witness for Tyson, Vicky Palmer testified that she works as a broiler manager for Tyson, and that she supervises five service technicians who visit farms, making sure that the chickens are taken care of and that the farm is following all State and Federal

- 9 -

regulations related to animal welfare. Palmer testified that she also performs the same tasks as service technicians. Palmer testified that she knows Garcia and that he was the farm manager for Nguyen. Palmer testified that, while working for Tyson, she visited the farm when both Mr. Ung and Nguyen owned it to give them various checklists about the nature of the product and advise of any changes that might need to be implemented.

Palmer testified that, when Nguyen became the owner, he would be at the farm on the weekends, and if Nguyen was at the farm, then she would deal directly with him. If Nguyen was not at the farm, Palmer would communicate with him by phone or e-mail, and, if changes needed to be made, she would communicate those to Nguyen by phone. According to Palmer, when she would visit the farm and Nguyen was not present, she provided Garcia with guidance on how to follow animal welfare standards and other matters. Palmer testified that when an absentee owner is not present, she deals with the worker who is left in charge. Palmer testified that, although she communicated with Garcia, she did not set his hours. Palmer also testified that Tyson did not hire Garcia, did not have the power to fire him, and did not pay him.

On cross-examination, when asked whether she was familiar with the circumstance that Nguyen's contract with Tyson could not have been signed unless Nguyen hired Garcia, Palmer responded: "That should never have been said." According to Palmer, Tyson's contract with the owner of a farm specifies that, if the owner does not live on the farm, then someone has to be on the farm,[8] but the contract does not specify who the owner must hire.

---

[8]Contrary to Palmer's testimony, as noted above, the contracts did not require that anyone live on the farm as an employee.

- 10 -

Palmer testified that because Nguyen is an absentee owner the person who would be left on the farm is whoever Nguyen chose to hire. Palmer also testified that Garcia took care of day-to-day operations but that she met with Nguyen on the farm almost every Friday. According to Palmer, most of the time, Nguyen was present on the farm when the chickens were picked up for processing, and Nguyen helped Garcia get the chickens out. Palmer confirmed that, in the event of a default under the contract, Tyson could go in and finish growing the flock of chickens on the farm. On redirect examination, Palmer testified that default of the contract by Nguyen was not an issue when Garcia worked on the farm.[9]

On his own behalf, Garcia testified that he worked at the farm for five years, starting when Mr. Ung hired him. After Mr. Ung died and Ms. Ung became the owner, Garcia became the farm manager and Tyson taught him how to raise the chickens and perform maintenance. The Tyson employees taught Garcia "everything" about raising chickens, including "how the system worked, how to check the water levels, the feeding, temperature, fans, how they would work properly, how to turn them on and off automatically." Garcia testified that Tyson employees taught him how to euthanize a chicken and how to tell if a chicken was ill. Tyson employees visited two to four times a week, but Palmer would visit more frequently if the chickens were ill. Garcia testified that, every six weeks, Tyson

---

[9]After the testimony of Watkins and Palmer, Tyson rested its case. At that time, Garcia's counsel moved for judgment. The circuit court denied the motion, ruling that there was "a considerable amount of evidence . . . that [could] be interpreted by a reasonable mind, . . . in different ways, and their conclusions might differ as it relates to the ultimate question which is whether or not Tyson was in fact a co-employer of [] Garcia." Counsel for UEF did not join the motion for judgment or independently move for judgment at that time.

employees would go over a flock visitation summary[10] with him, concerning what maintenance was needed and things related to ventilation, water, and feeding.

Garcia testified that Nguyen purchased the farm in 2013 and that Tyson employees advised Nguyen that Tyson needed to have somebody at the farm "24/7[.]" According to Garcia, Nguyen assured Tyson that he would have an employee at the farm, namely, him (Garcia). Garcia testified that he was already living at the farm and continued living there after Nguyen purchased it. Although Nguyen did not live at the farm, he would visit to give Garcia his paycheck, but later sent the paychecks by mail. Garcia testified that, at first, Nguyen visited the farm two to four times a week, but then there were weeks when Nguyen did not visit.

On cross-examination, Garcia acknowledged that, after Nguyen purchased the farm, he (Garcia) negotiated the amount of his pay with Nguyen. Garcia confirmed that he received his paychecks from Nguyen and that he never received a paycheck from Tyson. Garcia testified that, unlike Tyson employees, he never wore a shirt that said "Tyson." Garcia testified that, if there was a problem, a Tyson employee would talk with him to

---

[10]A flock visitation summary is a report prepared by Tyson based on a six-week inspection of the chickens. Garcia testified that the summary contained information about maintenance work to be performed, ventilation, water, and feeding. Garcia testified that he would go over the summary with a Tyson representative. A flock visitation summary dated December 19, 2013, was introduced into evidence as Garcia Exhibit 5. The summary contained notations such as "[r]emove old feed lids[,]" "[p]lease put standpipe on in [] (missing)[,]" and "[r]emove extra light[]bulbs[.]" Garcia's counsel also introduced into evidence Exhibit 4, a Broiler Technician Report, Exhibit 6, a Tyson Grow-out Broiler Technician Audit Form, Exhibit 7, a document providing an overview of what needs to be done with the generator and alarm system, and Exhibit 8, a lighting program, as evidence of paperwork that Tyson representatives left at the farm. These documents generally provided information concerning the maintenance of the chickens and chicken houses.

correct the problem. Garcia confirmed that, during a deposition, he had testified that no Tyson employee could fire him, but instead could only ask Nguyen to fire him. Garcia acknowledged that when he filed his workers' compensation claim, he identified Nguyen as his employer, not Tyson.

On his own behalf, Nguyen testified that he purchased the farm as an investment with the plan of having Garcia stay on to help because Garcia knew Tyson's chicken growing process. Nguyen testified that he entered into a broiler production contract with Tyson, but that before the contract was signed, he, Tyson employees, and Garcia met and agreed that if Garcia remained with the farm, the contract could be signed. According to Nguyen, when he entered into the contract, Tyson was aware that he had no experience raising chickens. Nguyen confirmed that the chickens belonged to Tyson and that they had to be fed according to Tyson's guidelines with feed that Tyson provided. Nguyen's understanding was that Tyson would provide guidelines and help out when Garcia encountered a problem.

On cross-examination, Nguyen acknowledged that when he purchased the farm, he convinced Garcia to continue working for him. Nguyen testified that he understood that, under the terms of the contract, he provided the labor, but Tyson provided the chickens, feed, medication, and technical assistance. On occasion, Tyson contacted Nguyen regarding modifications that needed to be made to comply with the contract. On a few occasions, Nguyen spoke with Palmer when she visited and, eventually, he authorized Garcia to act on his behalf in running the farm. Nguyen confirmed that he paid Garcia wages for running the farm and that he tasked Garcia with dealing with Tyson employees

when they visited the farm and he was not present. Nguyen testified that it was his obligation to take care of his employees and to service the contract. Nguyen testified that he had the power to fire Garcia. Nguyen acknowledged that, under the contract with Tyson, he was an independent contractor, not a partner, agent, employee, or joint venturer with Tyson.

Nguyen acknowledged that, after Garcia became sick and left the farm, he had a new tenant live on the farm (Garcia's replacement) and afterward had a few complaint calls from Tyson. As a result of those calls, Nguyen spoke with the tenant and warned that if the tenant could not comply with Tyson's requirements, he would have to find someone else. Nguyen ended up firing the person and hiring someone else. Nguyen conceded that Tyson did not have the power to fire one of his employees.

At the close of all of the evidence, Tyson's counsel moved for judgment as a matter of law, contending that the only possible conclusion to be drawn from the evidence was that Tyson was not Garcia's co-employer or employer. The circuit court denied the motion, ruling that there was evidence about which reasonable minds could differ and that the matter should be submitted to the jury. After the circuit court ruled on Tyson's motion for judgment, UEF's counsel stated: "Just for the record, State would like to make a motion for judgment[,]" and acknowledged that the court's "ruling would apply[.]" The circuit court denied the motion.[11]

---

[11]At this time, upon questioning by his counsel and the circuit court, Nguyen advised that he wanted to withdraw his appeal and that he would continue to respond to Tyson's appeal.

Next, the circuit court indicated that it had prepared jury instructions and a verdict sheet, and inquired as to whether there were any objections or requests. Tyson's counsel advised the circuit court that he had no objections or requests as to the jury instructions or verdict sheet. Garcia's counsel requested that additional language be included in the instruction on the employer-employee relationship, which the circuit court denied.[12] UEF's counsel made no objection to the proposed jury instructions or verdict sheet at that time. The circuit court instructed the jury, in pertinent part, as follows:

> In determining whether Mauro Jimenez Garcia is an employee of Tyson Farms, Inc., you should consider the following factors[:] the selection and hiring of Mr. Garcia, the payment of wages, the power to fire Mr. Garcia, the power of control over Mr. Garcia's conduct, whether the work is part of the regular business of Tyson Farms, Inc., whether the parties believed they were creating an employer/employee relationship, whether the work is usually done in the environment under the direction of an employer or by a specialist without supervision, and the skill required in the occupation.
>
> The most important factor is the power of control. One or more employers can employ an employee at the same time the employee sustains an accidental injury or occupational disease. The determination is made by applying the above factors to each potential employer as of the date of the accidental injury or the date of disablement for an occupational disease. The power to hire or discharge a worker can be vested in one person and the power of control in another.

Neither Tyson's counsel nor UEF's counsel raised any exceptions to the jury instructions.

The jury returned a verdict finding that Tyson was not a co-employer of Garcia at

---

[12]Garcia's counsel requested that the instruction be augmented to include language from case law indicating that "the person having that power of control is the master." Likewise, Nguyen's counsel requested that the instruction be supplemented to include "that the power of control is the only one that in itself [] could be determinative[.]" The circuit court denied this request stating that the pattern instruction as modified by the court accurately covered the issue. Prior to trial, UEF had filed requested jury instructions containing a request for a similar instruction as to the factor of control.

the time of his injuries. On July 3, 2018, the circuit court issued a remand order, reversing the Commission's finding that Tyson was a co-employer of Garcia and remanding the matter to the Commission for it to modify its prior decisions to indicate dismissal of Tyson as a party and to note payments to be made by Nguyen and UEF. UEF noted an appeal.

On November 22, 2019, a majority of a panel of the Court of Special Appeals reversed the circuit court's judgment. See Tyson Farms, 243 Md. App. at 409, 220 A.3d at 431. The Court of Special Appeals reasoned:

> [A]s a condition of its contract with [] Nguyen, Tyson required that [] Garcia remain on the farm 24 hours a day, 7 days a week, to manage its operation. In the contract itself, Tyson's 18-page Broiler Growing Guide detailed instructions and requirements for how to raise the chickens at each stage of their life cycle. This Guide included detailed instructions on how [] Garcia should adjust various factors such as the chickens' food intake, light exposure, and ventilation, on a weekly, if not daily, basis.
>
> Further, Tyson's employees taught [] Garcia everything he needed to know about raising the chickens, including how to operate the various systems involved in the process. Tyson's employees inspected the farm before every new flock of chickens was delivered, came to the farm one to three times a week to evaluate how [] Garcia was raising the chickens, and subsequently informed [] Garcia of the tasks that he needed to complete to improve his performance. Importantly, Tyson held the unilateral ability to terminate its relationship with [] Nguyen if [] Garcia did not comply with the requirements in the Contract or those given to him by Tyson employees. Finally, Tyson posted its own signage at the farm, provided the feed that [] Garcia was to give to the chickens, contracted for the treatment of litter, and provided veterinary services to the chickens that were placed on the farm. Taken in sum, Tyson's extensive involvement in, and control over, [] Garcia's day-to-day operation of the farm gave rise to an employment relationship as a matter of law.

Id. at 416-17, 220 A.3d at 435-36. The Court of Special Appeals concluded that the evidence "demonstrate[d] that differing inferences from the evidence [were] not possible," that the evidence was "sufficient to establish an employment relationship as a matter of

law," and that the circuit court erred in denying UEF's motion for judgment. Id. at 422, 220 A.3d at 438-39 (cleaned up).

In dissent, Judge Gould stated that, from his perspective, there were sufficient facts in the record to permit a finding that Tyson was not Garcia's co-employer. See id. at 422, 220 A.3d at 439 (Gould, J., dissenting). Judge Gould explained:

> Tyson's representative testified at trial that: (1) Tyson did not select or hire [] Garcia; (2) [] Nguyen, not Tyson, set and paid [] Garcia's wages; (3) Tyson had no ability to fire [] Garcia; (4) Tyson had no ability to set [] Garcia's work hours; and (5) Tyson would communicate with [] Nguyen about changes in practices for raising chickens.
>     In addition, [] Nguyen testified that: (1) he authorized [] Garcia to act on [] Nguyen's behalf in running the farm, from which a jury could reasonably have concluded that Tyson's interactions with [] Garcia were in [] Garcia's capacity as [] Nguyen's agent, not as Tyson's employee; (2) it was [] Nguyen's obligation to take care of his employees and service the contract with Tyson; (3) only [] Nguyen had the power to terminate [] Garcia's employment; and (4) [] Nguyen had the contractual ability to terminate his grower contract with Tyson and enter into a contract with another poultry company, suggesting that [] Nguyen, rather than Tyson, had ultimate control over whether [] Garcia continued to have a job raising chickens.
>     The Court of Appeals . . . reminded us not to confuse control of the workplace with control of the worker. With that in mind, in my view the evidence in this case allowed for the reasonable inference that, notwithstanding the specificity in Tyson's contractually-required procedures and practices for raising chickens, Tyson did not have the requisite control over [] Garcia to be considered his employer. At a minimum, . . . the evidence cut both ways. I would, therefore, affirm the judgment of the circuit court.

Id. at 424-25, 220 A.3d at 440 (Gould, J., dissenting) (cleaned up).

On January 21, 2020, Tyson petitioned for a writ of *certiorari*, raising the following two issues:

> 1. Did the court err in not allowing the jury to resolve conflicting facts and inferences regarding whether [] Garcia was Tyson's employee?

2.  Did the court err in concluding that no reasonable jury could find that []
Garcia was *not* Tyson's employee, even though Tyson's contract was with
the owner of the chicken farm, and Tyson did not hire (or fire) [] Garcia[,]
pay him[,] set his hours or wages[,] or have a contract with him?

(Emphasis in original).  On March 11, 2020, this Court granted the petition.  See Tyson

Farms, Inc. v. Uninsured Employers' Fund, 467 Md. 692, 226 A.3d 235 (2020).

## DISCUSSION[13]

### The Parties' Contentions

Tyson contends that the Court of Special Appeals erred in concluding that the issue

of whether Tyson had the power of control over Garcia was a question of law and not a

question for the jury.  Tyson maintains that control was a disputed factor and that the other

four factors relevant to employee status weighed against treating Garcia as an employee.

Tyson contends that the Court of Special Appeals's decision is contrary to existing case

law and that the circuit court properly determined that this case involved disputed facts that

the jury should resolve.  Tyson asserts that the Court of Special Appeals misconstrued the

control factor by focusing the inquiry on the workplace rather than the worker.  And, Tyson

maintains that the Court of Special Appeals overstated the importance of the control factor

and failed to recognize that the evidence permitted the reasonable inference that it did not

have the necessary control over Garcia to be considered his employer.

UEF responds that the Court of Special Appeals was correct in concluding that,

---

[13]Because the two questions presented in the petition for a writ of *certiorari* involve
the same issue—whether the Court of Special Appeals erred in concluding that the circuit
court erred in denying UEF's motion for judgment—we consolidate the questions.

based on the level of control that Tyson had over Garcia and his work, Tyson was a co-employer, and that the circuit court erred in denying its motion for judgment. UEF contends that an employer-employee relationship exists as a matter of law where the only inference to be drawn from the evidence is that a party controls the work of another. UEF argues that the control factor is the most important factor and that employer status can be established even if another entity hires, pays, and has the right to fire the employee. UEF asserts that, in this case, the evidence established that Tyson exercised extensive control over Garcia and his work, amounting to a constructive power to discharge, and that, even if the other four factors weighed against employer status, the Court of Special Appeals's decision was correct.

**Standard of Review**

LE § 9-737 authorizes judicial review of the Commission's decisions. On review in the circuit court, "the decision of the Commission is presumed to be prima facie correct" and "the party challenging the decision has the burden of proof." LE § 9-745(b). Pursuant to LE § 9-745(d), "[o]n a motion of any party filed with the clerk of the court in accordance with the practice in civil cases, the court shall submit to a jury any question of fact involved in the case."

Maryland Rule 2-519(a) provides, in relevant part, that "[a] party may move for judgment on any or all of the issues . . . in a jury trial at the close of all the evidence[,] stat[ing] with particularity all reasons why the motion should be granted." In Scapa Dryer Fabrics, Inc. v. Saville, 418 Md. 496, 503, 16 A.3d 159, 163 (2011), we explained the standard applicable to review of the grant or denial of a motion for judgment as follows:

- 19 -

An appellate court reviews the trial court's decision to allow or deny judgment . . . to determine whether it was legally correct, while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented.

(Cleaned up). And, in Thomas v. Panco Mgmt. of Md., LLC, 423 Md. 387, 394, 31 A.3d 583, 588 (2011), we stated:

[W]hen a defendant moves for judgment based . . . upon the legal insufficiency of the plaintiff's evidence, the trial [court] must determine if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, and if there is, the motion must be denied and the case submitted to the jury. It is only when the facts and circumstances only permit one inference with regard to the issue presented, that the issue is one of law for the court and not one of fact for the jury. An appellate court must review the grant or denial of a motion for judgment by conducting the same analysis as the trial [court].

(Cleaned up).

**Law**

This Court has recognized that a worker can at the same time be the employee of two employers. See Whitehead, 304 Md. at 79, 497 A.2d at 809 ("A worker may simultaneously be the employee of two employers." (Citation omitted)); Mackall, 293 Md. at 229, 443 A.2d at 102 ("This Court has repeatedly recognized that, under certain circumstances, a person performing a given function simultaneously may be the employee of two employers." (Citations omitted)). In Mackall, 293 Md. at 230, 443 A.2d at 103, this Court explained that we have "reiterated that the question whether an employer-employee relationship exists is one for the jury to determine." To that end, we have established the following five factors to determine whether an employer-employee relationship exists: "(1) the power to select and hire the employee, (2) the payment of

- 20 -

wages, (3) the power to discharge, (4) the power to control the employee's conduct, and

(5) whether the work is part of the regular business of the employer." Id. at 230, 443 A.2d

at 103. We explained that the "decisive test in determining whether" an employment

relationship exists "is whether the employer has the right to control and direct the employee

in the performance of the work and in the manner in which the work is to be done." Id. at

230, 443 A.2d at 103. "If there is evidence to support an inference that more than one

individual or company controls or directs a person in the performance of a given function,

the question of whether an employer-employee relationship exists is a question of fact to

be determined by the jury." Id. at 230, 443 A.2d at 103 (citations omitted).

In Whitehead, 304 Md. at 78, 497 A.2d at 809, this Court discussed the relationship

between the factors for determining whether an employer-employee relationship exists,

stating:

> Of the five factors, the factor of control stands out as the most
> important. We have said, for example, that whether the employer has the
> right to control and direct the employee in the performance of the work and
> in the manner in which the work is to be done is the decisive or controlling
> test. We have also recognized, in speaking to the interrelationship of the
> factors, that standing alone, none of these indicia, excepting (4) the factor of
> control, seems controlling in the determination as to whether such a
> relationship exists. Thus, for our purposes, decisive, besides controlling,
> means conclusive, determinative, and definitive. This view is consistent with
> that expressed in other jurisdictions, where control has been variously
> described as the most vital factor, the most important factor, the most
> significant factor in all cases, the most stressed element, the final test, and
> the crucial test, when determining whether the employer/employee
> relationship exists.

(Cleaned up). In Whitehead, id. at 76, 497 A.2d at 808, we stated that, ordinarily, where

evidence is disputed and differing inferences from the evidence are possible, "a jury must

- 21 -

determine the underlying employment issues." By contrast, ordinarily, where evidence is uncontradicted, "a court may decide the issue as one of law." Id. at 76, 497 A.2d at 808 (citations omitted). Nevertheless, where the evidence is uncontradicted, "the trial court should take some pains to ensure that conflicting inferences are not possible on the presented evidence," and "something more than conjecture of a party is necessary to establish that conflicting inferences are possible[.]" Id. at 76, 497 A.2d at 808 (cleaned up). For a party to establish conflicting inferences, "[a]t the very least, a party must point to evidence in the case that control of a given function is vested in more than one person." Id. at 76, 497 A.2d at 808 (cleaned up).

The factors are embodied in a pattern jury instruction on determining the existence of an employment relationship for purposes of workers' compensation, which provides:

> In determining whether (_____) is an Employee of (_____), you should consider the following factors:
>
> > (1) The selection and hiring of (_____);
> >
> > (2) The payment of wages;
> >
> > (3) The power to fire (_____);
> >
> > (4) The power of control over (_____)'s conduct;
> >
> > (5) Whether the work is a part of the regular business of (_____);
> >
> > (6) Whether the parties believed they were creating an employer-employee relationship;
> >
> > (7) Whether the work is usually done, in the environment, under the direction of an employer, or by a specialist without supervision;
> >
> > (8) The skill required in the occupation.

- 22 -

The most important factor is the power of control.

MPJI-Cv 30:15 (Employment Relationship).[14]

In <u>Mackall</u>, 293 Md. at 222-23, 231, 443 A.2d at 99, 103, a case in which the Commission determined that a worker was the employee of one company and the worker instituted a tort action against a second company, this Court held that there was sufficient evidence to support an inference that both companies were simultaneously the worker's employers and that, as such, the question of whether an employer-employee relationship existed with respect to the second company was a question of fact to be determined by the jury. Zayre Corporation ("Zayre") owned and operated a chain of retail department stores and Alden Millinery ("Alden") leased space from Zayre for the sale of wigs and millinery

---

[14]Similarly, the pattern jury instruction on determining generally whether an employer-employee relationship exists provides:

> In determining whether an employment relationship exists, five factors are considered:
>
> > (1) the power to select and hire the employee;
> >
> > (2) the payment of wages;
> >
> > (3) the power of discharge;
> >
> > (4) the power to control the employee's conduct; and
> >
> > (5) whether the work is part of the regular business of the employer.
>
> The most important factor in determining whether an employment relationship exists is whether the employer has the power to control and direct the manner of the work.

MPJI-Cv 3:2 (Employer/Employee Relationship).

at one of Zayre's stores. See id. at 222, 443 A.2d at 99. The worker was the manager of the Alden space in the Zayre store. See id. at 222-23, 443 A.2d at 99. The worker slipped and fell while at work and filed a workers' compensation claim identifying Alden as her employer, and the Commission awarded benefits to the worker, requiring Alden to pay compensation. See id. at 223, 443 A.2d at 99. Subsequently, the worker filed a tort action against Zayre, and the trial court conducted a trial on the issue of the worker's employment status. See id. at 223-24, 443 A.2d at 99-100. The trial court instructed the jury that a worker may simultaneously be the employee of two employers and submitted to the jury the questions of whether the worker was the employee of Alden, Zayre, or both. See id. at 226, 443 A.2d at 101. The jury determined that the worker was the employee of both Alden and Zayre. See id. at 226, 443 A.2d at 101.

At trial, the evidence showed that the worker had applied to work at the Zayre store using a Zayre employment application. See id. at 224, 443 A.2d at 100. An Alden supervisor asked the Zayre store manager for employment applications that were on file to fill a position with Alden. See id. at 224, 443 A.2d at 100. The Alden supervisor selected the worker's application and interviewed her. See id. at 224, 443 A.2d at 100. Although the Alden supervisor had authority to hire the worker, his practice was to allow the Zayre store manager to make the final decision. See id. at 224, 443 A.2d at 100. The Alden supervisor recommended to the Zayre store manager that the worker be hired, and the worker was subsequently hired to be Alden's manager. See id. at 224, 443 A.2d at 100. The worker was paid according to the pay scale applied to Zayre employees, her entitlement to pay increases was determined by the Zayre store manager based on his

performance evaluations, and the worker received the same fringe benefits that Zayre employees enjoyed, although Alden reimbursed Zayre for those expenses. See id. at 224-25, 443 A.2d at 100. The worker, like Zayre employees, punched a Zayre time clock, and Zayre personnel tallied and computed her hours and wages based on time sheets she submitted to Alden. See id. at 225, 443 A.2d at 100. The worker was paid with a Zayre check, for which Alden reimbursed Zayre. See id. at 225, 443 A.2d at 100. As to the power to discharge, both Alden and Zayre had independent authority to terminate individuals working for Alden, although the Zayre store manager ordinarily would notify Alden before doing so. See id. at 225, 443 A.2d at 100.

As to the power to control and direct the worker's conduct in the performance of her work, the evidence demonstrated that Alden determined the type and amount of merchandise to be sold, shipped merchandise that was received by the worker, trained the worker to keep books and records, and required the worker to send daily sales reports and stock inventories and weekly payroll reports. See id. at 225, 443 A.2d at 100. The worker, though, was also subject to the rules and regulations applicable to Zayre employees, wore a Zayre smock, and was required to eat in the Zayre lounge. See id. at 225, 443 A.2d at 100. Although the Alden supervisor was the worker's supervisor, the Zayre manager also supervised the worker, controlled the staffing of the Alden space, and had the authority to transfer a Zayre employee into the Alden space if the Alden space was not adequately staffed. See id. at 225, 443 A.2d at 100-01. And, the Zayre manager could assign the worker to the Zayre jewelry department during lunch when it was unattended. See id. at 225-26, 443 A.2d at 101. The Zayre manager also supervised and controlled the display

- 25 -

of Alden's merchandise and the cleanliness of the Alden space. See id. at 226, 443 A.2d at 101. Additionally, evidence was presented showing the interrelationship between the sale of Alden's goods and the regular business of Alden and Zayre. See id. at 226, 443 A.2d at 101.

This Court disagreed with the worker that there was no evidence presented supporting an inference that both Zayre and Alden were the worker's employers. See id. at 229, 443 A.2d at 102. We concluded that the evidence was sufficient to support an inference that both Alden and Zayre simultaneously were the worker's employers, and explained:

> [T]here was evidence to show that both Alden and Zayre participated in the selection and hiring of [the worker]. Both participated in the payment of her wages. Both had the power to discharge her. The retail sale of wigs and millinery was a part of the regular business of both. Most important, there was evidence to show that both exercised control over [the worker] in the performance of her duties.

Id. at 231, 443 A.2d at 103. Accordingly, we concluded that the question of whether an employer-employee relationship existed was a question of fact to be determined by the jury and that the trial court properly instructed the jury that the worker might simultaneously be the employee of both Alden and Zayre. See id. at 231, 443 A.2d at 103.

In Whitehead, 304 Md. at 70, 76, 497 A.2d at 805, 808, this Court concluded that the trial court properly decided as a matter of law the question of whether an employment relationship existed and that the evidence gave rise to no differing inferences as to whether the worker was an employee of the company to which the worker was provisionally assigned. Bay Services, Inc. ("Bay") was a temporary help agency that supplied unskilled

labor to its clients on request by selecting an employee from its available labor pool and assigning the worker to the job. See id. at 70, 497 A.2d at 805. The client was able to use and direct the worker as needed and the client recorded the hours worked and was billed by Bay. See id. at 70, 497 A.2d at 805. Bay paid the worker, maintained workers' compensation insurance, and paid unemployment insurance. See id. at 70, 497 A.2d at 805. Bay also interviewed and hired the temporary workers and reserved the right to fire the worker if performance on an assigned job was unsatisfactory. See id. at 71, 497 A.2d at 805. Safway Steel Products, Inc. ("Safway") contacted Bay, requesting two temporary workers, and Bay selected Sidney Whitehead and another worker for the job. See id. at 71, 497 A.2d at 805. At Safway, Whitehead was tasked with loading steel scaffolding onto a trailer and, while doing so, scaffolding fell on him and caused serious injury. See id. at 71, 497 A.2d at 805.

Whitehead received workers' compensation benefits from Bay for his injury and sought recovery against Safway through a negligence action. See id. at 71, 497 A.2d at 805. A jury trial was conducted and, at the close of Whitehead's case, Safway moved for a directed verdict, arguing that Whitehead was its employee and that his exclusive remedy was through a workers' compensation claim. See id. at 71, 497 A.2d at 805. The trial court denied the motion and the case was ultimately sent to the jury, which determined that Whitehead was not Safway's employee and that Safway was negligent in the operation of its workplace, and awarded damages to Whitehead. See id. at 71, 497 A.2d at 805. Safway moved for judgment notwithstanding the verdict, which the trial court granted, ruling that the uncontradicted evidence demonstrated that Safway controlled Whitehead's work. See

id. at 71, 497 A.2d at 805. The trial court's ruling meant that Whitehead was Safway's

employee and could seek a remedy for his injury only through a workers' compensation

claim; accordingly, Whitehead's negligence action was dismissed. See id. at 71, 497 A.2d

at 805. Whitehead appealed, and this Court issued a writ of *certiorari* on our own motion

prior to a decision by the Court of Special Appeals. See id. at 71-72, 497 A.2d at 805.

This Court concluded that the trial court properly determined the employment

relationship as a matter of law, and explained that Whitehead had "concede[d] that all

control of specific tasks while he was at Safway belonged entirely to Safway[,]" rendering

the employment relationship determination a question of law and making Whitehead's

"unsupported claim of conflicting inferences a nullity." Id. at 76-77, 497 A.2d at 808

(internal quotation marks omitted). As to whether Whitehead was Safway's employee, this

Court determined that "the control exercised by Safway over Whitehead clearly

establishe[d] an employer/employee relationship." Id. at 79, 497 A.2d at 809. We

explained:

> Safway instructed Whitehead on the task to be performed, supervised his
> work, and was free to reassign him to any other duties that warranted
> attention. If Whitehead's work was unsatisfactory, Safway was free to
> dismiss him and request an additional worker.
>     Moreover, the amount Safway was billed by Bay for its use of the
> temporary worker was greater than what Bay paid Whitehead. This extra
> cost doubtlessly helped cover, besides Bay's profit margin, such expenses as
> Bay's payment of Whitehead's unemployment and work[er]'s compensation
> insurance. In other words, Safway actually contributed to the insurance
> protection of one of its employees.
>     Of course, the fact that Whitehead was admittedly the employee of
> Bay at the precise time he worked for Safway does not alter this conclusion.
> . . . Safway had the right to instruct Whitehead on the tasks to be performed,
> had the power to reassign him to a different job within the plant, and
> supervised and directed his actions and rate of work. Safway could have

discharged the employee from its premises if Whitehead's work was unsatisfactory.

Id. at 79, 81-82, 497 A.2d at 809, 811. This Court stated that there were no conflicting inferences or disputes on the issue of control of Whitehead in the performance of the work. See id. at 82, 497 A.2d at 811.

In Great Atl. & Pac. Tea Co. v. Imbraguglio, 346 Md. 573, 590, 697 A.2d 885, 893 (1997), in pertinent part, this Court held that the trial court erred in granting summary judgment on the basis that a worker was simultaneously an employee of three companies. In that case, Salvatore Imbraguglio fell while at work and later died from his injuries. See id. at 579, 697 A.2d at 888. At the time of the accident, Imbraguglio was working for Supermarket Distribution Services, Inc. ("SDS"), a wholly owned subsidiary of the Great Atlantic and Pacific Tea Company, Inc. ("A & P"). See id. at 579, 697 A.2d at 888. The accident occurred in a warehouse owned by A & P, but managed by employees of Super Fresh Markets of Maryland, Inc. ("Super Fresh"), another wholly owned subsidiary of A & P. See id. at 579, 697 A.2d at 888. Super Fresh operated supermarkets on A & P's behalf, and SDS provided warehouses and distribution services for the supermarkets. See id. at 579, 697 A.2d at 888. A & P was self-insured for workers' compensation purposes and was the workers' compensation insurer for both SDS and Super Fresh. See id. at 579, 697 A.2d at 888. After the accident, Imbraguglio's widow filed a dependent's claim with the Commission, which awarded benefits that were to be paid by SDS. See id. at 579-80, 697 A.2d at 888. The widow then filed suit against A & P and Super Fresh, alleging premises liability on the part of A & P and joint liability against both A & P and Super

Fresh for failing to provide proper supervision at the warehouse where Imbraguglio was injured. See id. at 580, 697 A.2d at 888. A & P moved for summary judgment, contending that the widow's sole remedy was under the Workers' Compensation Act and that it was immune from suit as the workers' compensation insurer for SDS and Super Fresh. See id. at 580, 697 A.2d at 888. Super Fresh also sought immunity from suit, arguing that it was Imbraguglio's statutory employer. See id. at 580, 697 A.2d at 888. The trial court granted summary judgment in favor of A & P and Super Fresh, concluding that they, along with SDS, were Imbraguglio's employers and therefore entitled to immunity from suit under the exclusivity provisions of the Workers' Compensation Act. See id. at 580, 697 A.2d at 888-89. The widow appealed, and the Court of Special Appeals reversed, concluding that A & P's status as SDS's and Super Fresh's workers' compensation insurer did not necessarily make it immune from suit and that a material factual dispute existed to preclude a finding, as a matter of law, that Imbraguglio was a statutory employee of Super Fresh. See id. at 580-81, 697 A.2d at 889.

As to whether A & P and Super Fresh were employers of Imbraguglio, this Court reiterated that "[o]rdinarily, the existence of the employer/employee relationship is a question reserved for the fact finder." Id. at 590, 697 A.2d at 893. We explained, however, that where "the existence of the relationship is undisputed, or the evidence on the issue is uncontroverted, unless conflicting inferences can be drawn from that evidence, the trial court is entitled to treat the matter as a question of law." Id. at 590, 697 A.2d at 893 (citing Whitehead, 304 Md. at 76, 497 A.2d at 808). Applying those principles, we determined that we could not conclude that the record was sufficient for the trial court to determine, at

- 30 -

the summary judgment stage, as a matter of law, that Imbraguglio was an employee of

SDS, A & P, and Super Fresh.  See Imbraguglio, 346 Md. at 590, 697 A.2d at 893.  In

reaching that determination, we explained:

> Unlike the employee in *Whitehead*, there is no concession from [the widow] that [Imbraguglio] was in any way controlled by either A & P or Super Fresh, or under their direct managerial authority as was the workers' compensation claimant in [a different case] (and even then, the trial judge deferred to the jury).  There is no evidence from which the trial court could have concluded, as a matter of law, that (1) A & P or Super Fresh possessed the power to select and hire the decedent, or that (2) someone other than SDS paid his wages, (3) had the power to discharge him, or (4) had the power to control his conduct.  *See Whitehead*, 304 Md. at 77-78, 497 A.2d at 808.  At best, the record evidence cuts both ways.

Imbraguglio, 346 Md. at 593, 697 A.2d at 895.  We stated that A & P and Super Fresh

"confuse[d] control of the workplace with control of the worker" by asserting that the

widow's complaint alleged some control over Imbraguglio's workplace by them and thus

Imbraguglio was an employee of those who exercised that control over the workplace.  Id.

at 592-93, 697 A.2d at 894-95.  In a footnote, we explained:

> We observed in *Whitehead* that "the trial court should take great pains to ensure that conflicting inferences are not possible on the presented evidence."  Because of the increasing complexity of the employer/employee relationship, we believe that in multi-party cases, the employer/employee relationship will most often be a question of fact, not of law.  *Whitehead* [], 304 Md. [at] 76, 497 A.2d [at] 808 [].

Imbraguglio, 346 Md. at 593 n.13, 697 A.2d at 895 n.13.

More recently, in Elms v. Renewal by Andersen, 439 Md. 381, 386-87, 96 A.3d

175, 178-79 (2014), this Court held that the Commission erred in concluding that a worker

was an independent contractor and not an employee of a company.  We explained that the

Workers' Compensation Act applies to covered employers and employees, meaning that

the first inquiry is to determine whether the claimant is a covered employee and not an independent contractor. See id. at 392-93, 96 A.3d at 182. We reiterated that, to determine the existence of an employer-employee relationship, a court considers the five factors set forth in Whitehead. Elms, 439 Md. at 393, 96 A.3d at 182. We stated that "where the essential terms and manner of employment are undisputed, the issue as to the relation between the parties and the nature of the employment is one of law for the court." Id. at 394-95, 96 A.3d at 183 (cleaned up). Applying that principle, we concluded that the essential terms and manner of employment were undisputed and that the facts demonstrated the company's exercise of control over the worker, such that the worker was an employee of the company, not an independent contractor. See id. at 395-96, 96 A.3d at 183-84.

**Analysis**

Here, we hold that the Court of Special Appeals erred in concluding as a matter of law that Tyson was a co-employer of Garcia at the time that he was injured because there was sufficient evidence from which a reasonable jury could find—as it did—that Tyson was not a co-employer of Garcia. Stated otherwise, the circuit court properly denied UEF's motion for judgment (and Tyson's, for that matter), as the evidence in the case was susceptible to differing reasonable inferences, including the inference that Tyson did not exercise the control over Garcia necessary to be deemed a co-employer.[15]

_____

[15]We note that the issue as to whether the circuit court erred in denying UEF's motion for judgment was minimally preserved for appellate review. At the conclusion of the evidence in Tyson's case, UEF's counsel did not move for judgment. At the conclusion of all of the evidence, UEF's counsel moved for judgment "for the record" and did not provide an explanation for the motion. In other words, UEF's counsel provided no reason

- 32 -

It is well settled that where there is evidence supporting "an inference that more than one individual or company controls or directs a [worker] in the performance of a given [duty], the question of whether an employer-employee relationship exists is a question of fact to be determined by the jury[,]" Mackall, 293 Md. at 230, 443 A.2d at 103 (citations omitted), and not by the trial court as a matter of law. In other words, even where evidence is uncontradicted or undisputed, if there are conflicting inferences to be drawn from the evidence, the question of the existence of an employer-employee relationship is to be determined by the jury as a question of fact. See Whitehead, 304 Md. at 76, 497 A.2d at 808. This is precisely the case here—although the evidence is mainly uncontradicted, the evidence is susceptible to differing reasonable inferences, and as such, the circuit court properly denied UEF's motion for judgment and permitted the jury to decide the issue of co-employment as a question of fact.

Certainly, the central issue in this case was whether or not Tyson had the power to control Garcia's conduct. As this Court cautioned in Imbraguglio, 346 Md. at 592, 697 A.2d at 894-95, control of the workplace should not be confused with control of the worker. The evidence adduced at trial plainly demonstrated that Tyson regulated the operation of the workplace (a chicken farm) and the growth and handling of its product (the chickens). But Tyson's regulation of the workplace and the product does not equate to, or

---

for the motion for judgment. Maryland Rule 2-519(a) requires that in moving for judgment a party "state with particularity all reasons why the motion should be granted." By failing to comply with Maryland Rule 2-519(a), UEF's counsel arguably failed to preserve for appeal an issue as to the denial of the motion for judgment. The issue of preservation, however, was not raised in the Court of Special Appeals.

automatically mean, that it had the power to control Garcia's conduct necessary for it to be determined to be Garcia's co-employer as a matter of law.

In our view, the Court of Special Appeals erred in deciding the factor of control as a matter of law where the evidence of control of the worker in this case was susceptible to two equally reasonable inferences, that Tyson was or was not a co-employer of Garcia, and other factors—such as the selection and hiring of Garcia, payment of wages, and the ability to fire Garcia—weighed in favor of finding that Tyson was not Garcia's co-employer. By concluding that "Tyson exercised extensive control over [] Garcia's work at the farm, such that [] Garcia was an employee of Tyson[,]" Tyson Farms, 243 Md. App. at 421, 220 A.3d at 438, the Court of Special Appeals did not allow for the possibility that there were reasonable inferences to be drawn from the evidence that supported both sides of the argument.

This Court has explained that the decisive test in ascertaining whether an employment relationship exists is, indeed, whether an entity has the right to control the employee's conduct and performance of work.[16] See Mackall, 293 Md. at 230, 443 A.2d

---

[16]The pattern jury instruction on the employment relationship in the context of workers' compensation, MPJI-Cv 30:15, identifies factors a jury is to consider in determining whether an employment relationship exists and instructs that "[t]he most important factor is the power of control." Here, the record reveals that, a few days before trial, UEF filed with the circuit court its requested jury instructions in which it specifically requested that the circuit court give MPJI-Cv 30:15 and a jury instruction entitled "Factor of Control" indicating that control alone can be the decisive factor in determining the existence of an employment relationship. The circuit court did not give the instruction UEF requested on control. The circuit court instructed the jury in accord with MPJI-Cv 30:15 and stated that "[t]he most important factor is the power of control." We note that neither Tyson's counsel nor UEF's counsel offered any exceptions to the jury instructions.

at 103. In discussing the five factors, we have stated that, "[o]f these five, control is paramount and, in most cases, decisive." Imbraguglio, 346 Md. at 591, 697 A.2d at 894 (citing Whitehead, 304 Md. at 78, 497 A.2d at 809). Recognizing that case law provides that control is the decisive factor in determining an employer-employee relationship does not affect the circumstance that there were differing reasonable inferences that could be drawn from the facts in this case as to whether Tyson controlled Garcia's conduct to the point that Tyson could be considered Garcia's co-employer. Under the standard of review applicable to motions for judgment, viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party (here, Tyson), we conclude that the circuit court properly denied UEF's motion for judgment because the facts and circumstances did not permit only one inference as to the issue of whether Tyson was a co-employer of Garcia. See Scapa Dryer Fabrics, 418 Md. at 503, 16 A.3d at 163; Thomas, 423 Md. at 393-94, 31 A.3d at 587-88.

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to Tyson reveals the following. The testimony of Watkins, a Tyson representative, established that Tyson does not have the right to hire or fire workers on a farm with whom Tyson contracts and Tyson does not set the hours for the workers. When specifically asked who controlled the workers, Watkins responded: "The farm owner."

---

At oral argument, UEF's counsel stated that he thought the jury instruction given by the circuit court specifically instructed that control in and of itself can be conclusive, but that is not the case. Ultimately, by not excepting to the jury instructions given by the circuit court—which identified control as but one factor, albeit the most important factor, in determining whether an employment relationship existed—in our view, UEF essentially agreed that the jury need not be instructed that control could be a decisive factor.

Palmer, another Tyson representative, whose job included visiting the farm, confirmed that Tyson did not hire Garcia, have the authority to fire Garcia, or pay Garcia. And, Tyson did not set Garcia's work hours. Although Palmer indicated that she communicated with Garcia, if changes needed to be made, she also communicated changes directly to Nguyen.

Garcia testified that, after Nguyen purchased the farm, Nguyen (not Tyson) asked him to stay on and the two negotiated his pay. Garcia received paychecks from Nguyen, never received a paycheck from Tyson, and, unlike Tyson employees, he never wore a shirt that said "Tyson." And, Garcia confirmed that he had previously testified at deposition that Tyson could not fire him, but instead could only ask Nguyen to fire him. Similar to Garcia, Nguyen testified that, after purchasing the farm, he convinced Garcia to continue working for him. Nguyen acknowledged that he understood that, under the terms of the contract with Tyson, he provided the labor, whereas Tyson provided the chickens, feed, medication, and technical assistance. According to Nguyen, he authorized Garcia to act on his behalf in running the farm and tasked him with dealing with Tyson employees when they visited the farm and he was not present. Nguyen acknowledged that it was his obligation to take care of his employees, that he paid Garcia, that he had the power to fire Garcia, and that Tyson did not have the ability to independently fire one of his employees.

What can be reasonably inferred from the testimony and the other evidence adduced at trial is that, although Tyson may have had certain contractual requirements concerning the operation of a chicken farm—including practices and procedures for producing chickens and maintaining the chicken houses—taking the evidence in the light most favorable to Tyson, there are conflicting inferences to be drawn as to whether Tyson had

sufficient control over Garcia's work performance to be deemed a co-employer. The evidence illustrated that Tyson did not establish Garcia's work hours or otherwise control or specify his daily work schedule or routine. Although there was testimony indicating that Tyson required someone to live at the farm to manage the farm's operation, Palmer, Tyson's broiler manager, specifically testified that it should not have been said that Tyson required Garcia to live on the farm. Indeed, a review of the contract reveals that the contract did not specify that any particular person live on the farm. And, even if there had been a conversation between Nguyen and Tyson representatives (as Nguyen alleged) that the contract could not be signed unless Garcia continued to live on the farm, the contract included a clause stating that the contract and schedules contained the entire agreement between the parties. Thus, any conversation between Nguyen and Tyson representatives concerning the need for Garcia to live on the farm would have been superseded by the contract, which contained no such provision.

Although Tyson employees may have interacted and communicated with Garcia, this was because Nguyen had authorized Garcia to act on his behalf in running the farm. As Judge Gould pointed out in dissent, from this testimony, a jury could reasonably have concluded that Garcia acted as Nguyen's agent in interacting with Tyson's representative and not as an employee. See Tyson Farms, 243 Md. App. at 424, 220 A.3d at 440 (Gould, J. dissenting). Moreover, Palmer communicated changes directly to Nguyen because Nguyen had ultimate control and responsibility for the farm and executing Tyson's requirements, not Garcia. And, in contrast to the significance that the Court of Special Appeals gave to the circumstance that Tyson could unilaterally terminate the contract with

- 37 -

Nguyen if the contract requirements were not complied with, see id. at 417, 220 A.3d at 435-36, Nguyen testified that he had the ability to terminate the contract and enter into a contract with another poultry company if he was unhappy with Tyson. From this testimony, a juror could reasonably have inferred that Nguyen had control over his workers, including Garcia and whether he (Garcia) would continue to serve as the farm manager raising chickens provided by Tyson or chickens provided by another company.

Undoubtedly, Schedule B of the contract contained numerous subsections setting forth, among things, a performance improvement plan and conditions to be maintained at the farm, such as housing specifications, ventilation requirements, cooling systems, and feeder and drinking equipment. Under the section titled "Performance Improvement Program," Schedule B indicated that a producer/owner could be placed on "Intensified Management Status" after three consecutive failures to meet certain standards and could be subject to termination if the producer/owner continued to not meet the specified standards. Nonetheless, control of Garcia's conduct as a farm worker arguably remained with Nguyen. Plainly, the language in Schedule B authorized the termination of the farm owner who is the producer—in this case, Nguyen—but did not give Tyson the authority to terminate/fire any of Nguyen's employees, such as Garcia. The other provisions of Schedule B pertained to standards to be met with respect to the physical facilities and equipment used to raise the chickens. For example, in Schedule B, Tyson contracted to have the ability to control the conditions affecting the growth of the chickens, such as, among things, the water supply to the broiler house, ventilation, the placement of vent boxes in the broiler house, and requiring that a broiler house's feeder and drinking systems

- 38 -

met Tyson's specified guidelines. Nothing in Schedule B, though, purported to give Tyson control over or supervision of any worker on the farm. Nguyen was free to direct Garcia to perform work on the farm or Garcia was free to make his own decisions about performing the work, albeit in a manner that met Tyson's requirements, but under a workday schedule or manner that Nguyen and Garcia chose to implement. If the end result was that Nguyen's and Garcia's efforts did not satisfy Nguyen's contractual obligations, Tyson could terminate the contract. Perhaps, Tyson could have asked Nguyen to replace Garcia, but the ultimate decision as to hiring and firing/replacing Garcia was Nguyen's alone.

Likewise, the Broiler Growing Guide did not establish the sole inference that Tyson had control of Garcia as an employee. The guide was not a prescription of work hours for a farm worker or even a prescription of daily work activities. Rather, the guide appeared to set forth approximate weekly goals for the growing of a flock of broilers. The guide did not specify any day of the week any tasks were to be performed or the hours in which a worker was to work. The guide also did not identify who (which worker) was to perform the specific duties. Instead, the guide stated that it contained a set of practices recommended to assist the producer/owner in growing a flock and, unlike Schedules A and B, the guide was not signed by Tyson and Nguyen. The guide certainly did not purport to set forth employment responsibilities for farm workers. If a producer/owner deviated from the guide, but nonetheless produced an acceptable flock of broilers, the producer/owner's obligations under the contract would have been satisfied. As such, it cannot be said that the guide established that there was no reasonable inference other than that Tyson

controlled Garcia's conduct and was Garcia's co-employer.

Of the other factors used to determine the existence of an employer-employee relationship, the evidence showed that the power to select and hire Garcia was Nguyen's; that Nguyen paid Garcia's wages; and that only Nguyen—and not Tyson—could fire Garcia. Nguyen's testimony demonstrated that he could have fired Garcia at any time and simply ended the contract with Tyson or sought to hire a different farm manager. In fact, Nguyen testified that after Garcia became ill, he hired someone else and he eventually fired that person and hired yet another person. Put simply, given Watkins's, Palmer's, and Nguyen's testimony about the power to hire and discharge Garcia, it would not be accurate to state that the only inference that could be drawn from the evidence is that Tyson was Garcia's co-employer.[17] Rather, the factors concerning the ability to hire and fire and the payment of wages give rise to the inference that Nguyen was Garcia's sole employer. As to the factor of whether the work is part of the regular business of the employer, raising chickens is part of the regular business of both Tyson and Nguyen. This factor is in

---

[17]UEF asserts that Tyson had the power of constructive discharge. This contention is misplaced. Black's Law Dictionary defines "constructive discharge" as "[a]n employer's creation of working conditions that leave a particular employee or group of employees little or no choice but to resign, as by fundamentally changing the working conditions or terms of employment; an employer's course of action that, being detrimental to an employee, leaves the employee almost no option but to quit." *Constructive Discharge*, Black's Law Dictionary (11th ed. 2019). That clearly is not the case here. There was no evidence presented whatsoever showing that Tyson created undesirable working conditions on Nguyen's farm that forced any farm worker, let alone Garcia, to resign, or that Garcia or another farm worker had no option but to quit as a result of any action by Tyson. Rather, the record reflects that, at most, Tyson could potentially ask Nguyen to discharge Garcia, but the ultimate power to actually discharge resided in Nguyen and Tyson had no authority at all to discharge one of Nguyen's employees.

equipoise.

In short, because the evidence supported differing inferences about whether Tyson or Nguyen or both controlled Garcia's conduct as an employee and other factors to be considered weighed in favor of finding that Nguyen was Garcia's only employer, the circuit court properly denied UEF's motion for judgment and allowed the jury to determine as a question of fact whether an employer-employee relationship existed between Tyson and Garcia. At bottom, there were disputed inferences about control and the circuit court properly denied motions for judgment because it could not be determined as a matter of law that Garcia was an employee of Tyson.

The existence of an employer-employee relationship—and evaluation of the factors relevant to that determination—is necessarily a fact-specific case-by-case inquiry. From our perspective, Mackall and Imbraguglio support our holding in this case—that the question of whether an employer-employee relationship existed was a question of fact to be determined by the jury and that the circuit court properly submitted the issue to the jury. Although Mackall and Imbraguglio are factually distinguishable from this case, both cases support the holding that determination of an employment relationship is a question of fact for the jury to determine—not a matter of law for the trial court to determine—where there is sufficient evidence to support an inference that more than one individual or company controlled the worker's conduct. The evidence in this case certainly permitted the reasonable inference that Tyson did not have the control over Garcia necessary to be considered his employer or that, as we stated in Imbraguglio, 346 Md. at 593, 697 A.2d at

895, "[a]t best, the [] evidence cuts both ways."[18]  When the evidence could cut either way, the circuit court is correct in submitting the issue of co-employment to the jury.

And, notably, the circumstances in Whitehead are distinguishable from those of this case in a very important way—in that case, Whitehead had conceded that all control of the tasks he performed while at Safway belonged to Safway.  See Whitehead, 3024 Md. at 76, 497 A.2d at 808.  As a result of that concession, we concluded that the existence of an employment relationship was a question of law, not a question of fact, that could be determined by the trial court.  See id. at 76-77, 497 A.2d at 808.  In this case, Tyson has

---

[18]In our view, the Court of Special Appeals's reliance on the Supreme Court of New Jersey's opinion in Marcus v. E. Agric. Ass'n, Inc., 161 A.2d 247 (N.J. 1960) (per curiam) is misplaced.  See Tyson Farms, 243 Md. App. at 418-19, 220 A.3d at 436-37.  In Marcus, 161 A.2d at 247 (per curiam), in 1960, a divided Supreme Court of New Jersey, in a one-sentence *per curiam* opinion, stated that "[t]he judgment is reversed for the reasons expressed in the dissenting opinion of Judge Conford in the court below."  A review of that opinion—Marcus v. E. Agric. Ass'n, Inc., 157 A.2d 3, 5-6 (N.J. Super. Ct. App. Div. 1959)—reveals that the issue in that case was whether a chicken farm operator/owner who was injured on his farm was an employee of the chicken company for whom he raised chickens pursuant to an oral agreement.  A majority of that court concluded that the evidence and "inferences to be drawn therefrom preponderantly establish[ed] the existence of an independent contractor relationship."  Id. at 10.  In a dissent later adopted by the majority of the Supreme Court, Judge Conford disagreed that the owner/operator was an independent contractor and instead would have concluded that the owner/operator was an employee of the company, and, specifically, that there was sufficient evidence of control warranting such a conclusion.  See id. at 10, 12, 14 (Conford, J., dissenting).  Significantly, in that case, the owner/operator had no employees, see id. at 6, and the case did not concern whether any employee of the owner/operator was an employee of the company.  Stated otherwise, the case involved a question of whether someone in Nguyen's position—not Garcia's—was an employee of the company pursuant to an oral agreement.  The contracts between Nguyen and Tyson expressly specified that Nguyen was an independent contractor and not an employee of Tyson.  In our view, Marcus does not provide any analogy for determining whether Tyson was a co-employer of Garcia and whether the circuit court properly denied UEF's motion for judgment.

not conceded that it had control over Garcia's conduct, and instead has disputed the reasonable inferences to be drawn from the evidence presented as to the control factor.[19]

As a final matter, we note that, to be sure, Tyson uses a standard broiler production contract with chicken farms, and juries could possibly reach differing results as to whether farm workers similarly situated to Garcia (a farm manager for an absentee owner) are employees or not of Tyson. At oral argument, Tyson's counsel acknowledged that circumstances could vary from farm to farm. Tyson's counsel contended that simply using the standard contract with Tyson for raising chickens should not automatically transform Tyson into an employer for each and every person working on a chicken farm with which Tyson contracts. Although there may be a concern that different juries could reach different results based on similar facts, each case will necessarily involve its own set of circumstances and trial courts (and appellate courts) must take a case-by-case approach. We refrain from announcing a blanket rule that under the standard Tyson contract, any on-site manager for an absentee owner either is or is not Tyson's employee. In other words, we are not endorsing the idea that Tyson can never be found to be an employer or co-employer of a farm worker. The trier of fact will need to examine the circumstances of the

---

[19]Unquestionably, the Workers' Compensation Act is a remedial statute and where there is ambiguity as to its terms, the Court construes the Act liberally in favor of injured employees to effectuate the benevolent purposes of the statute. See Elec. Gen. Corp. v. LaBonte, 454 Md. 113, 131, 164 A.3d 157, 168 (2017). Although the Act provides a definition of the term "covered employee," see LE §§ 9-101(f), 9-202, the Act does not define the term "employee" or define the employer-employee relationship. The existence of an employment relationship is to be determined based on the factors set forth in case law. Thus, in this instance, we are not confronted with ambiguous language in the Act; rather, we must determine whether the Court of Special Appeals erred in determining as a matter of law that Tyson was a co-employer of Garcia.

case to determine whether an employer-employee relationship exists between Tyson and a chicken farm worker.

In sum, we hold that the circuit court correctly denied motions for judgment and submitted to the jury the factual question of whether an employer-employee relationship existed between Tyson and Garcia. This is so because the evidence in the case was susceptible to differing reasonable inferences, including the inference that Tyson did not exercise the control over Garcia necessary to be considered a co-employer. Accordingly, we reverse the Court of Special Appeals's judgment.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. RESPONDENT TO PAY COSTS.**

Circuit Court for Worcester County
Case No. 23-C-16-000233

Argued: October 5, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 5

September Term, 2020
_____

TYSON FARMS, INC., ET AL.

v.

UNINSURED EMPLOYERS' FUND
_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.
_____

Dissenting Opinion by McDonald, J.
_____

Filed: November 20, 2020

The Majority Opinion is thorough and carefully written. However, I find the opinion of Judge Wright on behalf of the panel majority in the Court of Special Appeals more persuasive. *See* 243 Md. App. 406 (2019). Accordingly, I dissent.

The question in this case is not whether Mr. Nguyen, on the one hand, or Tyson Farms, on the other, was the employer of Mr. Garcia. It is undisputed that Mr. Nguyen was an employer of Mr. Garcia. The question is whether Tyson Farms also qualified as an employer for purposes of the Workers' Compensation Act – more specifically, whether, on the undisputed facts, it was a co-employer of Mr. Garcia for purposes of the Act as a matter of law.

As the Majority Opinion recounts, the case law identifies five factors to be considered in assessing who qualifies as an employer and identifies "control" of the employee as the preeminent factor. Majority slip op. at 20-21. In my view, "control" is *the* determining criterion and the other listed "factors" – whether the employee's work is part of the "regular business" of the putative employer and whether that person technically has authority to hire or fire the employee and pay wages – are simply ways to assess whether that person controls, in some manner, the work of the employee.

In this case, the technical authority to hire or fire Mr. Garcia may have rested with Mr. Nguyen, who also was the conduit for the payment of Mr. Garcia's wages.[1] But it is

---

[1] Of course, as the Majority Opinion notes, Tyson Farms exercised considerable sway over Mr. Nguyen's decisions whether to hire or fire an employee. Mr. Nguyen testified that retention of Mr. Garcia at the farm was a condition of the execution of his contracts with Tyson Farms and that Tyson Farms was instrumental in Mr. Nguyen's firing of Mr. Garcia's successor when the latter employee failed to satisfy Tyson Farms. *See* Majority slip op. at 13-14.

undisputed that Mr. Nguyen bought the farm as an investment, was an absentee owner, and knew nothing about operating a chicken farm. Tyson Farms was not a mere consultant, as is evident from the testimony at trial and the two contracts and attached schedules that governed the chicken farm. It was Tyson Farms that trained Mr. Garcia and directed what he did to operate the farm. It required his presence 24/7 at the farm. It dictated the design of the chicken house in elaborate detail, as well as the work to be done there. The various requirements of the contracts are stated in mandatory language.[2] If those requirements were not met, Tyson Farms had the right under the contracts to take over direct operation of the chicken house. As the Court of Special Appeals explained in its opinion, Tyson Farms controlled where Mr. Garcia was, what he did, and what his working conditions were.

Finally, as this Court has stated numerous times, where "the essential terms and manner of employment" are undisputed, the nature of that employment for purposes of the Workers' Compensation Act is a question of law for the court. *Elms v. Renewal by Andersen*, 439 Md. 381, 394-95 (2014) (collecting cases). There was no genuine factual dispute in this case about the essential terms and manner of employment of Mr. Garcia. In my view, Tyson Farms exercised sufficient control over the work of Mr. Garcia to be a co-

---

[2] It is notable that the occupational disease identified by Mr. Garcia in his workers' compensation claim – and found by the Workers' Compensation Commission – related to the dust and chemicals he breathed while spending 7-10 hours per day, six days a week, in a chicken house with poor ventilation. Schedule B of Tyson Farms' Broiler Production Contract specifies in minute detail the design of the chicken house, including ventilation, cooling systems, lighting, water, etc.

employer for purposes of the Act as a matter of law. It is unsurprising that the Workers

Compensation Commission reached that conclusion. I would affirm the Court of Special

Appeals' decision that reached the same conclusion.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/5a20cn.pdf